The Honorable Alcee L. HASTINGS,
U.S. District Judge, Appellant,

v.

JUDICIAL CONFERENCE OF the
UNITED STATES, et al.

No. 84–5576.

United States Court of Appeals,
District of Columbia Circuit.

Argued April 12, 1985.

Decided Aug. 13, 1985.

Terence J. Anderson, School of Law, Univ. of Miami, Coral Gables, Fla., with whom Robert S. Catz, College of Law, State Univ., Cleveland, Ohio, John W. Karr, Karr & Lyons, Washington, D.C., Joseph J. Huss, Hollywood, Fla., were on brief, for appellant.

John Doar, for appellee, Investigative Committee of the Judicial Council of the 11th Circuit and Brook Hedge for appellees Dept. of Justice, et al., Washington, D.C., Richard K. Willard, Joseph E. diGenova, Sandra M. Schraibman and Harold J. Krent, Dept. of Justice, Washington, D.C., entered appearances for appellee.

Daniel J. Popeo and George C. Smith, Washington, D.C., were on brief, for Washington Legal Foundation, amicus curiae, urging affirmance.

Before EDWARDS and BORK, Circuit Judges, and McGOWAN, Senior Circuit Judge.

McGOWAN, Senior Circuit Judge:

Appellant, United States District Judge Alcee L. Hastings, seeks reversal of a judgment by the District Court dismissing his suit to enjoin the continuation of an investigation of his judicial conduct by an investigative committee of the Judicial Council of the Eleventh Circuit. The investigation was initiated pursuant to the Judicial Councils Reform and Judicial Conduct and Disability Act of 1980, 28 U.S.C. §§ 331, 332, 372(c), 604 (1982) [hereinafter, "the Act"]. Appellees are the Judicial Conference of the United States; the Chief Justice of the United States, in his capacity as presiding officer of the Conference; the Judicial Council of the Eleventh Circuit; the Chief Judge of the Eleventh Circuit; the member-judges of the Investigating Committee; and the Attorney General of the United States.

Appellant's complaint contains four counts. The first alleges that the Act is unconstitutional on separation-of-powers and due process grounds. Count Two asserts that the application of the Act to appellant violates the same constitutional principles. Count Three alleges that the Committee's investigation of Judge Hastings is the result of a conspiracy among judges of the Eleventh Circuit to violate Hastings' constitutional rights. The final count claims that appellant's rights under the Privacy Act of 1974, 5 U.S.C. § 552a (1982), have been violated in connection with the investigation. On cross-motions for summary judgment, the District Court rejected the challenge in Count One to the

facial validity of the Act. The Court dismissed Counts Two and Three as unreviewable under the explicit terms of the Act. Finally, the Court dismissed the Privacy Act count for failure to state a cognizable claim.

For the reasons hereinafter appearing, we hold that, at the time the District Court rendered its decision, adjudication of Counts One and Two was premature. We therefore vacate the District Court's grant of summary judgment to appellees on Count One and affirm the District Court's dismissal of Count Two. We also affirm the District Court's dismissal of Counts Three and Four, although, as with Count Two, our reasons for holding these counts properly dismissed differ from those offered by the District Court.

## I

The Act established a formal mechanism by which federal judges could be disciplined by fellow judges for "conduct prejudicial to the effective and expeditious administration of the business of the courts." 28 U.S.C. § 372(c)(1). "Any person" alleging such conduct on the part of a judge may set that mechanism in motion by filing with the clerk of the circuit in which the judge sits a complaint containing a "brief statement of the facts constituting such conduct." *Id.* The clerk of the court must then transmit the complaint to the chief judge of the circuit (or to the next most senior active service judge of that circuit, if the chief judge is the subject of the complaint), as well as to the judge who has been named in the complaint. The chief judge, after "expeditiously reviewing a complaint," *id.* § 372(c)(3), may take any of several courses of action. He may dismiss the complaint if it either (1) fails to conform with the requirements for a complaint stated above, or (2) directly relates to the

merits of a decision or procedural ruling, or (3) is frivolous. *Id.* § 372(c)(3)(A). The chief judge may also conclude the proceeding if he finds that "appropriate corrective action has been taken." *Id.* § 372(c)(3)(B).

If the chief judge neither dismisses the complaint nor concludes the action, he must appoint a special committee, consisting of himself plus equal members of circuit and district judges of the circuit, to investigate the facts and allegations contained in the complaint. *Id.* § 372(c)(4). The Act grants the committee the power to conduct an investigation "as extensive as it considers necessary." *Id.* § 372(c)(5).

When the committee has completed its investigation, it is required to file with the judicial council of the circuit [1] "a comprehensive written report ... present[ing] both the findings of the investigation and the committee's recommendations for necessary and appropriate action by the judicial council of the circuit." *Id.* § 372(a)(5). Upon receiving the committee's report, the circuit judicial council may conduct any additional investigation it considers necessary. In addition, the judicial council "shall take such action as is appropriate to assure the effective and expeditious administration of the business of the courts within the circuit." *Id.* § 372(a)(6)(B). Such action may include requesting that the judge voluntarily retire; ordering that, "on a temporary basis for a time certain," no further cases be assigned to the judge; and public or private censuring of the judge. *Id.*

Rather than take such action itself, however, the judicial council has the option of referring a complaint, along with the record of any proceedings undertaken to that point and the council's recommendations for appropriate action, to the Judicial Conference of the United States. *Id.* § 372(c)(7)(A).[2] The Act also requires

---

1. The judicial council of each circuit is presided over by the chief judge of the circuit and consists, in addition, of a certain number of circuit and district judges of that circuit, the number to be fixed by a majority vote of the active circuit judges of that circuit in accordance with 28 U.S.C. § 332(a) (1982).

2. The Judicial Conference is composed of the chief judges of all the circuits plus a designated district judge from each circuit, and is presided over by the Chief Justice of the United States. *See* 28 U.S.C. § 331 (1982).

transfer to the Judicial Conference of any case in which the circuit judicial council determines, on the basis of a complaint and an investigation under this subsection, or on the basis of "information otherwise available to the council," *id.* § 372(c)(7)(B), that a judge has engaged in conduct that either (1) might constitute one or more grounds for impeachment under Article I of the Constitution, or (2) "in the interest of justice, is not amenable to resolution by the judicial council." *Id.*

Having had proceedings transferred to it from a circuit judicial council via either of the above paths, the Judicial Conference, "after consideration of the prior proceedings and such additional investigation as it considers appropriate," *id.* § 372(c)(8), shall, by majority vote, take any of the courses of action, described above, that were open to the judicial council. In addition, if the Conference determines—either on its own or upon review of the judicial council's determination—that consideration of impeachment may be warranted, it shall transmit its determination to the United States House of Representatives "for whatever action the House of Representatives considers to be necessary." *Id.*

In any investigation undertaken pursuant to the Act, the investigating body, be it the special committee, the circuit judicial council, or the Conference, is vested with full subpoena powers. *Id.* § 372(c)(9)(A), (B); *see id.* §§ 331, 332(d). The Act also gives each such body the power to prescribe rules for the conduct of its proceedings, although such rules must provide certain minimum procedural safeguards.[3]

The Act expressly limits the availability of review of orders and determinations made under the Act. *See* 28 U.S.C.

§ 372(c)(10). A petition for review may be filed with the circuit judicial council by a complainant or judge aggrieved by an order of the chief judge, pursuant to § 372(c)(3), dismissing a complaint or concluding a proceeding, *see supra* p. 1095. An aggrieved complainant or judge may also petition the Judicial Conference for review of action taken by the judicial council pursuant to § 372(c)(6). With these two exceptions, "all orders and determinations, including denials of petitions for review, shall be final and conclusive and shall not be judicially reviewable on appeal or otherwise." *Id.* at § 372(c)(10).

## II

As a description of the proceedings so far will reveal, little of the Act has as yet come into play. On December 29, 1981, a federal grand jury indicted appellant, a district judge in the Southern District of Florida since 1979. The indictment charged appellant with conspiracy to solicit and accept money in return for being influenced in his performance of official acts as a United States district judge. The indictment further alleged that appellant had informed his co-conspirator, one William Borders, of the substance and date of issue of a forthcoming judicial order and that Borders had in turn passed the information on to a person he believed to be a defendant in the case involved.

After an unsuccessful motion to quash the indictment on the ground that the sole means of punishing a judge for high crimes and misdemeanors is impeachment by Congress, appellant was brought to trial. His co-conspirator had already been convicted of the conspiracy counts in a separate trial,

---

**3.** Such rules shall contain provisions requiring that—
    (A) adequate prior notice of any investigation be given in writing to the judge or magistrate whose conduct is the subject of the complaint;
    (B) the judge or magistrate whose conduct is the subject of the complaint be afforded an opportunity to appear (in person or by counsel) at proceedings conducted by the investigating panel, to present oral and documentary evidence, to compel the attendance of witnesses or the production of documents, to cross-examine witnesses, and to present argument orally or in writing; and
    (C) the complainant be afforded an opportunity to appear at proceedings conducted by the investigating panel, if the panel concludes that the complainant could offer substantial information.
28 U.S.C. § 372(c)(11) (1982).

and his conviction had been upheld against an attack on sufficiency grounds in an opinion that detailed the evidence against appellant as well as Borders. Appellant's trial, however, ended in acquittal.

On March 17, 1983, two federal district judges filed with the Eleventh Circuit a complaint under § 372 of the Act, charging that appellant had engaged in conduct prejudicial to the effective and expeditious administration of the business of the courts and had violated several Canons of the Code of Judicial Conduct for United States Judges. The specific allegations referred both to the conduct on which the indictment rested and to other conduct and statements by appellant occurring in the course of the criminal proceedings against him.[4]

On March 29, 1983, the Honorable John C. Godbold, Chief Judge of the Eleventh Circuit, appointed an investigative committee consisting of himself, two federal circuit judges, and two federal district judges. The Committee in turn appointed a private attorney as its counsel.

The Committee began its investigations on June 3, 1983, with the filing of a petition in the Southern District of Florida for access to the materials of the grand jury that had indicted appellant and his co-conspirator. The petition was granted over appellant's objections, and the order granting the petition was affirmed by a panel of the Eleventh Circuit. *In re Petition to Inspect and Copy Grand Jury Materials,* 735 F.2d 1261 (11th Cir.), *cert. denied,* — U.S. —, 105 S.Ct. 254, 83 L.Ed.2d 191 (1984).[5]

Approximately six months after the investigation began, appellant filed this action in the United States District Court for the District of Columbia, seeking a declaration that the Act is void and an injunction against continuation of the proceedings taken against him pursuant to the Act. As stated earlier, his complaint contains four counts. The first count challenges the facial constitutionality of the Act on separation-of-powers and due process grounds. The second count attacks the constitutionality of the Act as applied to Judge Hastings. Count Three alleges that the complaint filed against Judge Hastings under § 372(c)(1) of the Act, and the proceedings thereafter initiated, are the product of a conspiracy to violate his constitutional rights. The fourth count alleges a violation of appellant's rights under the Privacy Act, 5 U.S.C. § 552a (1982).

As of the date of the District Court's decision in this case, the Investigative Committee was still at work. No report had issued from the Committee with recomendations for disposition of the complaint.

### III

In the District Court, appellant had set forth three grounds for his Count One allegation that the Act is facially unconstitu-

---

**4.** The complaining judges alleged that:

(1) Judge Hastings had conspired with Borders to obtain a bribe in return for an official judicial act;

(2) Judge Hastings made "public and unfounded statements" that the United States was prosecuting him on racial/political grounds;

(3) Judge Hastings knowingly and publicly exploited his judicial position or acquiesced in such exploitation by others acting on his behalf by accepting financial donations from lawyers and other members of the public to defray the costs of his criminal defense;

(4) Judge Hastings, by his own testimony, had allowed *ex parte* contacts between his law clerk and counsel in pending cases concerning substantive issues in those cases and concerning the content of orders and opinions not yet entered, and had "completely abdicat-ed and delegated" his judicial decision-making authority to his law clerk;

(5) Judge Hastings, by his own testimony, had told counsel in a judicial proceeding that he had read an important precedent when he knew he had not and explained his deception by implying that it was common for judges to make such deliberate misstatements;

(6) Judge Hastings, by his own testimony, had exploited his judicial position by soliciting funds for someone he knew was a convicted federal offender.

*Hastings v. Judicial Conference of the United States,* 593 F.Supp. 1371, 1376–77 (D.D.C. 1984).

**5.** The panel was actually composed of three specially designated circuit judges from other circuits, as all of the Eleventh Circuit Judges had recused themselves from the appeal. *See In re Petition, supra,* at 1265 n. 3.

1098

tional, each of which grounds were rejected by the Court. First, appellant argued that Congress lacks the power to provide the judiciary with the means to discipline Article III judges. Under the separation-of-powers doctrine, Congress alone, through the impeachment power, may discipline judges for misconduct in office. The Act's provisions, appellant contended, represent an unlawful delegation of Congressional authority to a branch—the judiciary—constitutionally incapable of disciplining itself.

The District Court held that the Act does not violate the separation-of-powers doctrine because it is precisely "in order to assure the integrity and independence of the judicial branch" that these, and earlier, limitations have been placed on the independence of any individual federal judge. 593 F.Supp. at 1379. The Court stated: "The independence of the judiciary depends both on the courage and integrity of individual judges and on the public perception of the institution as fair, impartial and efficient. The judiciary has the inherent power to govern itself in a manner that will achieve these ends." *Id.* at 1380. The Act, the Court concluded, "represents a legitimate exercise of Congress's 'necessary and proper' power to effectuate that judicial power." *Id.* Rather than intrude upon judicial independence, Congress "was simply recognizing the need to give the courts reasonable means to put the judiciary's own house in order." *Id.* The court also held that the impeachment provisions of Article II neither preclude the Judicial Conference from recommending to the House that particular judges be impeached nor preempts the judicial councils or the Judicial Conference from invoking the various disciplinary measures open to them under the Act.

Appellant also argued that the Act's standards of misconduct are constitutionally vague and overbroad and impermissibly chill his and all other federal judges' constitutionally guaranteed judicial independence. The District Court disagreed. According to the court, the standard set forth in § 372(c)(7)(B)(i)—i.e., "conduct which might constitute one or more grounds for

impeachment"—gave clear notice to Judge Hastings that his alleged conduct was proscribed. With respect to the alleged bribe and obstruction of justice, the Court stated that "[i]t is difficult to imagine any conduct by a judge, if it occurred, more worthy of impeachment," 593 F.Supp. at 1382, and that "'[o]ne to whose conduct a statute clearly applies may not successfully challenge it for vagueness.'" *Id.* (quoting *Parker v. Levy*, 417 U.S. 733, 756, 94 S.Ct. 2547, 2561, 41 L.Ed.2d 439 (1974)). As to the standard set forth in § 372(c)(1)—i.e., "conduct prejudicial to the effective and expeditious administration of the business of the courts"—the court noted that it was "necessarily broad" and, when read in the light shed by its legislative history, was not vague. 593 F.Supp. at 1382.

Finally, appellant asserted that the procedures authorized by the Act violate his fifth amendment rights to due process of law. Specifically, he contended that the Act (1) prevents him from confronting the evidence against him, and (2) impermissibly combines investigative and adjudicatory powers, so as to render impossible a fair adjudication. The court found no merit to either of Judge Hastings' due process claims. The court read the Act to require a judge under inquiry to have the right to confront all the evidence against him, although not to give the judge the right "to re-confront old evidence at every stage where it is considered." *Id.* at 1383. As to the combination of investigative and adjudicatory functions, the court held that not to constitute a due process violation in itself, *id.* at 1384 (citing *Withrow v. Larkin*, 421 U.S. 35, 58, 95 S.Ct. 1456, 1470, 43 L.Ed.2d 712 (1975)), and found Judge Hastings to have failed to make the requisite showing of unfair risk in this instance.

As to Count Two, the challenge to the constitutionality of the Act as applied to appellant, and Count Three, the conspiracy claim, the District Court held that adjudication was barred by § 372(c)(10) of the Act, which precludes judicial review of "orders and determinations" made with respect to

individual judges. Regarding Count Two, the Court stated:

> While there is always a basic presumption of judicial review and a Congressional intent to preclude review must be explicit, the language of the Act and its legislative history plainly show that Congress intended to establish an absolute bar against judges under inquiry seeking judicial review of actions taken against them pursuant to the Act. Congress's power to preclude such judicial review is well established. Accordingly, this Court must conclude it has no jurisdiction over Judge Hastings' Count Two claims concerning the present and possible future application of the Act to him.

593 F.Supp. at 1377–78 (citations and footnotes omitted). The same reasoning applies, the Court held, to review of the Chief Judge's order to initiate that investigation, "even if Judge Hastings seeks to clothe his request for review in the language of conspiracy." 593 F.Supp. at 1384.

Addressing Count Four, the Privacy Act claim, the District Court simply found no violation of the relevant statutory provisions:

> Count Four states on its face no Privacy Act claim in regard to past actions by the Justice Department, since the Act requires neither that Judge Hastings be notified nor approve of any disclosures made. See 5 U.S.C. § 552a(b)(7), (e)(8). The Justice Department memorandum mentioned in paragraph 57 of the amended complaint merely states in most general terms matters already of public record. No violation of the regulations cited emerges. As for future cooperation between the Justice Department and the Investigating Committee, that has been resolved by In re Petition, 576 F.Supp. 1275 (S.D.Fla.1983), aff'd, 735 F.2d 1261 (11th Cir.1984). Finally, the due process allegations against the Investigating Committee defendants in Count Four represent yet another attempt by Judge Hastings to short-circuit the exclusive review process vested by the Act in the judicial councils and the Conference, and this Court cannot consider them. See 28 U.S.C. § 372(c)(10). Thus no cause of action is stated in Count Four.

593 F.Supp. at 1385.

In support of his appeal from the District Court's ruling against his Count One claim that the Act is facially unconstitutional, Judge Hastings raises the same three arguments rejected by the District Court. Judge Hastings also appeals the District Court's unfavorable ruling on Counts Two through Four. We hold that adjudication of both Counts One and Two is premature. We affirm the dismissal of Counts Three and Four, although for reasons different from those stated by the District Court.

## IV

Count One of appellant's complaint touches matters of profound importance for the federal judicial system. The need for some means by which federal judges might "put their own house in order," *Chandler v. Judicial Council*, 398 U.S. 74, 85, 90 S.Ct. 1648, 1654, 26 L.Ed.2d 100 (1970), has been recognized since 1939, when a committee of distinguished jurists chaired by Chief Justice Hughes successfully proposed the statutory organization of the judicial councils and the Judicial Conference. *See id.* That those bodies could constitutionally be vested with *some* powers by which to effect the goals of the 1939 Act seems also to be established. *See id.* at 86 n. 7, 90 S.Ct. at 1654 n. 7 ("We see no constitutional obstacle preventing Congress from vesting in the Circuit Judicial Councils, as administrative bodies, authority to make 'all necessary orders for the effective and expeditious administration of the business of the courts within [each] circuit.' ") Nevertheless, the precise limits to the powers that could constitutionally be exercised by the judicial councils and the Judicial Conference have yet to be judicially defined. Indeed, before the 1978 Act, no particular powers were statutorily conferred; the assumption seems to have been that the self-administrative power of the judiciary was implicit in the very structure

of the judicial councils and the Judicial Conference. The Supreme Court, however, expressed discomfort with such a vague scheme in *Chandler, supra,*[6] and Congress, in the 1980 Act, responded by vesting specific investigative and disciplinary powers in the judicial councils and the Judicial Conference.

As to each of the investigatory and disciplinary powers conferred by the Act, there may be a question of whether Congress may lawfully vest such power in an administrative organ of the federal judiciary composed of Article III judges. Regardless whether such a question may be asked, however, a court may provide an answer only in an appropriate adjudicatory setting.

Whether the District Court correctly deemed appellant's suit to be a proper occasion on which to decide these important matters depends upon what had happened to appellant by the time of the District Court's decision. The record reveals that a complaint had been filed against appellant; the chief judge of the circuit in which the complaint was filed had formed an investigative committee of judges; and the investigation had begun. Precisely how far it had progressed the record does not tell. We do know, however, that the committee had not yet issued a report of its conclusions and recommendations to the Council for any further action deemed proper.

When such a report does eventually issue, it may recommend that the Council invoke one or another of its delineated disciplinary powers. The report, however, may well urge the Council to transfer the proceedings directly to the Judicial Conference, or, alternatively, to conclude the proceedings against appellant. Even if some disciplinary measure were recommended to the Council, the Council would be free to reject that recommendation and decline to impose any sanction on appellant. Moreover, should the council determine to exer-

cise any of its specified disciplinary powers, that determination would be reviewable upon petition to the Judicial Conference. The Conference would then have before it the same panoply of options available to the Council, including the option of concluding the proceedings. The Conference would also be free to recommend impeachment to the House of Representatives.

We belabor the possible outcomes under the Act only to demonstrate that they are, as yet, only *possibilities.* Anything might happen in the proceedings initiated against appellant, from early dismissal to a recommendation of impeachment. Of the powers the Act vests in the judicial administrative organs, few, some, or many may be invoked against appellant. Yet appellant asks this court for a declaration that *none* of the powers vested by the Act can constitutionally be exercised.

■ It is an established and salutary principle of the law of federal courts that constitutional issues affecting legislation will not be determined "in advance of the necessity of deciding them" or "in broader terms than are required by the precise facts to which the ruling is to be applied." *Rescue Army v. Municipal Court of Los Angeles,* 331 U.S. 549, 569, 67 S.Ct. 1409, 1420, 91 L.Ed. 1666 (1947). Even for those cases that are clearly within the limits of federal jurisdiction, the Supreme Court has "developed for its own governance ... a series of rules under which it has avoided passing upon a large part of all the constitutional questions pressed upon it for decision." *Ashwander v. Tennessee Valley Authority,* 297 U.S. 288, 346, 56 S.Ct. 466, 482, 80 L.Ed. 688 (1936) (Brandeis, J., concurring). As the Court has stated:

This Court has recognized in the past that even when jurisdiction exists it should not be exercised unless the case "tenders the underlying constitutional is-

---

**6.** *Chandler* involved a separation-of-powers challenge by a federal district judge to an order by the Judicial Council of the Tenth Circuit finding the judge unable or unwilling to discharge his duties efficiently and directing that no additional cases be assigned to the judge until further order of the Council. The Supreme Court declined to reach the merits of the judge's challenge on the ground that he had failed to seek relief initially from the Council itself.

sues in clean-cut and concrete form." *Rescue Army v. Municipal Court,* 331 U.S. 549, 584 [67 S.Ct. 1409, 1427, 91 L.Ed. 1666] (1974). Problems of prematurity and abstractness may well present "insuperable obstacles" to the exercise of the Court's jurisdiction, even though that jurisdiction is technically present. *Id.* at 574 [67 S.Ct. at 1422].

*Socialist Labor Party v. Gilligan,* 406 U.S. 583, 588, 92 S.Ct. 1716, 1719, 32 L.Ed.2d 317 (1972).

This principle of constitutional avoidance was well illustrated by a pair of opinions in the same case, the first by this court, *Buckley v. Valeo,* 519 F.2d 821 (D.C.Cir. 1975), and the second by the Supreme Court, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976). *Buckley* involved a multi-pronged attack on the Federal Election Campaign Act of 1971. One aspect of the attack was a challenge to the constitutionality of the method of appointment to, and powers to be exercised by, the newly-created Federal Election Commission. This court reached the merits only of the appointment issue and the validity of one of the Commission's powers—the power to issue advisory opinions. The former issue was clearly adjudicable because the Commission had already been appointed. The latter issue was also adjudicable because an advisory opinion might, under the statute, be issued at any time.

The Court declined, however, to pass on the constitutionality of the statutory conferral upon the Commission of the remaining powers challenged in the lawsuit—namely, the power to disqualify candidates for office, to enact rules, to conduct investigations using, if necessary, the power of subpoena, and to initiate civil actions. The Court stated its underlying reasoning thus:

> In its present stance, this litigation does not present the court with the concrete facts that are necessary to an informed decision. No party has been joined in a civil enforcement action initiated by the Commission; no one has been disqualified from running for office; the Commission has enacted no rules; nor has

any party been adversely affected by the exercise of most of the Commission's broad powers under 2 U.S.C. §§ 437d, 437g. In fact, some of the issues presented to us in the certified questions may never reach a stage at which they would be ripe for adjudication.

519 F.2d at 893 (citations and footnotes omitted).

In reviewing the decision of the Court of Appeals, the Supreme Court reached the merits of the constitutionality of each of the Commission's statutory powers. The Court's opinion, however, did not call into question the reasoning or judgment of the Court of Appeals. Rather, the Court's discussion implicitly reaffirmed the principle of constitutional avoidance underlying the Appeals Court's decision:

> Since the entry of judgment by the Court of Appeals, the Commission has undertaken to issue rules and regulations under the authority of § 438(a)(10). While many of its other functions remain as yet unexercised, the date of their all but certain exercise is now closer by several months than it was at the time the Court of Appeals ruled.

424 U.S. at 115–17, 96 S.Ct. at 680–81. The Court thus made clear that, only because the exercise of the Commission's various powers was imminent and "all but certain," was it justified in deciding the constitutionality of those powers.

In the instant case, as in *Buckley,* appellant asks this court to pass on the constitutionality of an entire Act of Congress that vests in an entity a host of powers, most of which have not been invoked and many of which may never be invoked in the proceedings concerning appellant. To decide the legitimacy of powers whose exercise is the antithesis of "all but certain" would clearly contravene the principle of constitutional avoidance underlying both this court's and the Supreme Court's decisions in *Buckley,* the principle that "the quarrel must be with the official and not the statute book." P. Bator, P. Mishkin, D. Shapiro & H. Wechsler, Hart &

Wechsler's Federal Courts and the Federal System 141 (2d ed. 1972).

Concededly, certain informal fact-gathering powers have been exercised by the Committee. Under *Buckley*, this Court might seem justified in deciding the constitutionality of such powers. To do so, however, would contravene another aspect of avoidance—the policy of rendering judgment on the constitutionality of proceedings *while* the proceedings themselves are going on. As *Chandler* found, action by the judicial councils "has few of the characteristics of traditional judicial action and much of what we think of as administrative action." 398 U.S. at 88 n. 10, 90 S.Ct. at 1655 n. 10. The Councils, in short, are essentially "administrative bodies." *Id.* at 86 n. 7, 90 S.Ct. at 1654 n. 7. As is traditional in judicial review of administrative action, a court should be loath to interfere, by means of injunction, with ongoing proceedings by a particular council. *See Abbott Laboratories v. Gardner*, 387 U.S. 136, 148–49, 87 S.Ct. 1507, 1515–16, 18 L.Ed.2d 681 (1967); 4 K. Davis, Administrative Law Treatise § 26:10, at 460 (2d ed. 1983) ("Only the most exceptional circumstances will justify a judicial interruption of an ongoing administrative proceeding...."). Like administrative agencies, as well as state courts, *see Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), the councils and Conference are entitled to a measure of comity sufficient to preclude disruptive injunctive relief by federal courts absent a showing that serious and irremediable injury will otherwise result.

Appellant has not, and indeed cannot, show that such injury is likely to occur if this court does not grant his request for injunctive relief. As discussed *supra* pp. 1100–1101, the proceeding concerning appellant may terminate at any number of points before sanctions have been imposed upon him. Moreover, appellant has available his constitutional challenge to the validity of provisions of the Act in every one of the situations in which he is exposed to the threat of injury. Thus, he may interpose his constitutional arguments, e.g., as a defense to a subpoena, as a ground for review by the Conference of a Council determination, and in a lawsuit such as this one, brought when injury is significantly more immediate and concrete than it is now. *See Buckley*, 424 U.S. at 116–17, 96 S.Ct. at 681.

Appellant does not face the dilemma—frequently a feature of ripeness cases—of whether, on the one hand, to change his actual or intended behavior to comply with a law or regulation and in consequence to forego whatever advantage he might otherwise have gained, or on the other hand, to refuse to comply and risk initiation of a proceeding against him. *See* 4 K. Davis, *supra*, § 25:6 at 367–73 (discussing cases). That dilemma exists only when there is simply a threat of proceedings, not an actual, initiated proceeding. Appellant is therefore made no worse off by having to await final disposition of the proceeding.

In sum, we decline appellant's invitation to invalidate the entire Judicial Councils Reform and Judicial Conduct and Disability Act of 1980 merely on the basis of the fraction of that Act that has so far been invoked. The words of this court's opinion in *Buckley* are instructive:

As might be expected in an area as novel and complex as this, which implicates all segments of the federal establishment, the manner of constituting [the Federal Election Commission], the tasks assigned to it, and the authority conferred upon it are in many respects unique. It may eventually prove to be true that some of that authority may be found, when and if exercised in a concrete context, in conflict with the Constitution. But so essential to the effective functioning of the overall legislative scheme is the existence of the new agency contrived to monitor and administer it that a court should be alert to the relationship of the agency to that scheme. The one without the other risks the frustrations and failures of the past. Unless it can clearly find that the agency is wholly without legitimacy in the very terms by which it is

brought into being, the court's hands should be stayed.

519 F.2d at 888.

■ We must permit the proceedings against appellant to unfold as they will. In the course of time we may have a more concrete application of the Act as a whole. Then, and only then, will we be justified in deciding the facial constitutionality of the Act. Accordingly, we vacate the District Court's grant of summary judgment to appellees on Count One.

### V

■ Adjudication of appellant's claim in Count Two that the Act has been unconstitutionally applied to him is also premature. We see no difference relevant to the policy against interference with ongoing proceedings between appellant's challenge to the facial constitutionality of the statute under which this proceeding is being carried out and his challenge to the constitutionality of the statute as applied in the proceeding. The same requirement of irreparable harm must therefore be met in this case, and, for the reasons stated above, appellant cannot do that. Dismissal of Count Two was therefore proper.

Our pretermission of the merits of Count Two, however, encompasses the issue of whether claims such as those raised by Count Two are precluded from judicial review, as the District Court held. That issue, like all other interpretive and constitutional issues posed by the Act, must await an appropriate occasion for disposition. Until the applicability of the Act in an individual case is properly before a court, the preclusion *vel non* of questions of the Act's application is unripe. We therefore affirm only the District Court's bare ruling of dismissal of Count Two; we do not affirm the Court's reasoning with respect to that count.

### VI

■ We also affirm the dismissal of Count Three—the conspiracy claim—on somewhat different grounds from those enunciated by the District Court. In the litigation over whether the investigative committee would have access to the grand jury materials, *see supra* p. 1097, one of appellant's grounds for objecting to such access was that the petition, and the investigation it initiated, were part of a conspiracy of judges to deprive him of his constitutional rights. Expressly addressing appellant's conspiracy claims, the Eleventh Circuit panel stated:

> Judge Hastings' charge that the Committee's investigation is part of a larger conspiracy is not a proper subject for consideration in this appeal. The investigation is being conducted pursuant to the Act and the district court was not the proper forum for addressing any underlying questions of constitutional abuse. Those concerns may be raised by Judge Hastings in a challenge to the actions, if any, taken by the Judicial Council.[10]

[10] Under section 372(c)(10) a judge aggrieved by an action of the judicial council of the circuit may petition the Judicial Conference of the United States for review of that action.

*In re Petition, supra,* 735 F.2d at 1275 & n. 10.

In view of this holding, we cannot but conclude that appellant has already had a full and fair opportunity to litigate his claim of conspiracy. The Eleventh Circuit's holding that such a claim is barred by § 372(c)(10) of the Act is binding on Judge Hastings for all future litigation between himself and the committee over matters related to this investigation. Appellant may not reassert his conspiracy claim in this or any other court. *See National Treasury Employers Union v. Internal Revenue Service,* 765 F.2d 1174, 1176 (1985) (collecting authorities).

We wish to make clear, however, that our ruling is not intended as an endorsement of the Eleventh Circuit's view of the preclusion issue raised by appellant's conspiracy claim. We herein express no view ourselves on that issue.

### VII

■ As to Count Four, we are satisfied that dismissal was proper, although again for reasons somewhat different from the District Court's. The disclosures by Justice Department officials to the Investi-

gative Committee concerning the criminal proceedings against Judge Hastings were proper as a "routine use" under the Privacy Act, 5 U.S.C. § 552a(a)(7), (b)(3), (e)(3)(D), and the applicable regulations, *see* 42 Fed.Reg. 53,288, 53,332. Moreover, even if a claim of a violation of the Privacy Act could be made out, appellant would not be entitled to the declaratory and injunctive relief he seeks, such relief not being among those expressly made available to remedy past disclosures made in violation of the Privacy Act. *See* 5 U.S.C. § 552a(g)(1); *see also Clarkson v. IRS*, 678 F.2d 1368, 1375 n. 11 (11th Cir.1982); *Hanley v. Department of Justice*, 623 F.2d 1138, 1139 (6th Cir.1980); *Parks v. IRS*, 618 F.2d 677, 684 (10th Cir.1980); *Cell Associates, Inc. v. NIH*, 579 F.2d 1155, 1160–61 (9th Cir. 1978).[7]

In sum, we hold that, at the time the District Court rendered its decision, adjudication of Count One was premature, and we therefore vacate the District Court's grant of summary judgment to appellees on Count One. For the same reason, we hold that dismissal of Count Two was proper, although we do not affirm the ruling of the District Court that judicial review of Count Two is barred by the Act. Finally, we affirm the dismissal of Count Three on grounds of collateral estoppel and affirm the dismissal of Count Four as proper under the terms of the Privacy Act. We remand this case to the District Court for entry of an order of dismissal without prejudice.

*It is so ordered.*

HARRY T. EDWARDS, Circuit Judge, concurring:

PROLOGUE

At the birth of our nation, Alexander Hamilton charted one of the fundamental precepts upon which our system of government is founded:

> [The] independence of the judges is ... requisite to guard the constitution and the rights of individuals [against legislative encroachments and] from the effects of those ill humours which the acts of designing men, or the influence of particular conjunctures, sometimes disseminate among people.[1]

For the nearly 200 years that have passed since Hamilton wrote these words, we have endeavored to preserve an *independent judiciary* as a "citadel of the public justice and the public security."[2] Our Founding Fathers were clear in their determination to reject the English tradition which had fostered legislative interference with the regular courts of justice.[3] And, regardless of differences in legal philosophy, proponents of judicial activism and judicial restraint alike have long agreed that, in order to fulfill its designated constitutional role, the judiciary must be independent in all ways that might affect substantive decisionmaking.

In light of our long tradition of an independent judiciary that has been largely free from legislative tampering, it is ironic that, in 1985, a member of the federal judiciary is being tried under an act of Congress that purports to define judicial misconduct and to authorize sanctions—short of actual removal—against offending judges. What is even more curious to me is the apparently unquestioning acceptance by the judiciary of an act that may, in part, be significantly at odds with our basic constitutional structure and previously inviolate principles of separation of powers.

My concern with Judge Hastings' case has less to do with issues of individual

---

**7.** With regard to the due process claims in Count Four, we find them meritless. Even if, as appellant suggests may be the case, the request by the Committee for the information supplied by the government did not satisfy the statutory requirement of a writing, that technicality would hardly rise to the level of a violation of due process rights.

**1.** THE FEDERALIST No. 78, at 527 (A. Hamilton) (J. Cooke ed. 1961).

**2.** *Id.* at 524.

**3.** P. HOFFER & N. HULL, IMPEACHMENT IN AMERICA 1635–1805 xi (1984).

misconduct than with a potentially unconstitutional legislative incursion into the judicial province. In our haste to assail Judge Hastings outside of the constitutionally prescribed impeachment process, we seemingly have lost sight of Hamilton's words. In our zeal for efficiency and moral purity in the judicial ranks, we may be indulging a cavalier assumption that the independence of the judiciary will not suffer significantly from "minor" legislative encroachments. Our self-righteous finger-pointing at Judge Hastings may blind us to the reality that his case has more to do with the potential diminution of the independence of the judiciary than with the alleged misconduct of an individual judge. If Judge Hastings can be made to answer, outside of the criminal and impeachment processes, for judicially-related activities, pursuant to a loosely constructed congressional act regulating judicial "misconduct," one wonders about the sanctity of separation of powers and the inviolability of judicial independence. After this case has become ripe and is finally adjudicated, I hope that these issues will not be lost amidst cavalier assumptions or ignored because of our hesitation to deal with delicate and difficult questions of constitutional law.

## I.

As to the first two counts of Judge Hastings' complaint, I concur in Judge McGowan's able opinion holding that the case currently is not ripe to consider the constitutionality of the disciplinary provisions of the Judicial Councils Reform and Judicial Conduct and Disability Act of 1980. 28 U.S.C. § 372(c) (1982) (the "Judicial Conduct and Disability Act of 1980" or the "Act"). I concur in the judgment as to the third and fourth counts. I write separately, however, to reflect on some grave concerns that I have with certain issues raised by this case.

## II.

The misconduct with which Judge Hastings is charged—*inter alia* conspiracy to solicit bribes, allowing improper *ex parte* contacts between his staff and counsel, and total abdication of his decisionmaking authority—is precisely the sort of behavior that all would agree undermines the integrity of the judiciary and the judicial process. The Act authorizes the judicial councils for the federal circuits and the Judicial Conference of the United States to investigate such allegations of misconduct and, if a council or the Conference finds the allegations to be supported, to take disciplinary action, short of actual removal from office, against the offending judge. I worry that, in our ardor to ensure that behavior such as that of which Judge Hastings is accused not taint our judicial system, we may be tempted to slight the serious constitutional questions that the Act poses. Fifteen years ago the late Senator Sam J. Ervin, Jr., then chairman of the Senate Judiciary Subcommittee on Separation of Powers, cautioned in connection with the contemporary clamor for judicial reform that "some deeply concerned persons would emulate the example of Sampson, who, in his blind zeal, destroyed the pillars on which the temple rested." [4] We must heed that warning today.

The constitutional questions raised by Judge Hastings are important and difficult. The case is not, as the appellees seem to suggest, about whether the Act's interference with "the unfettered freedom of judges to engage in 'conduct prejudicial to the effective and expeditious administration of the business of the courts'" violates Article III. Brief for Defendants/Appellees the Judicial Conference of the United States, *et al.* at 37–38 (quoting 28 U.S.C. § 372(c)(1)). Rather, it is about the fundamental meaning of the guarantee of an independent judiciary under Article III. Does this guarantee mandate simply a judiciary that is largely free from control by

---

**4.** Ervin, *Separation of Powers: Judicial Independence,* 35 Law & Contemp. Probs. 108, 122 (1970).

coordinate branches or does it also compel that, appellate review and mandamus excepted, judges be independent of one another?

The Framers believed that an independent judiciary was crucial to a free republic. It is clear that to them the term "independent judiciary" meant at least that the judiciary be essentially separate from the other "great departments of power."[5] Quoting Montesquieu's *Spirit of the Laws*, Alexander Hamilton declared in *The Federalist No. 78* that "'there is no liberty, if the power of judging be not separated from the legislative and executive powers.'"[6] These same views were echoed by James Madison at the Constitutional Convention:

> Judges should not hold their places by ... [uncertain] tenure ... [b]ecause they might be tempted to cultivate the Legislature, by undue complaisance, and thus render the Legislature the virtual expositer, as well as the maker of the laws.[7]

To insulate the judiciary from pressure from the other branches, the authors of the Constitution granted federal judges life tenure, subject to a good behavior requirement, and freedom from potentially coercive reductions in their salaries. U.S. Const. art. III, § 1. The Constitution has long been understood to establish impeachment as the only method available to the coordinate branches for the actual removal of judges from offices. U.S. Const. art. I,

§ 2, cl. 5 and § 3, cl. 6; art. II, § 4. As Hamilton explained, "[t]his is the only provision on the point, which is consistent with the necessary independence of the judicial character."[8] History thus teaches us that the Framers "hoped to make the judges free from popular pressure and from legislative control. Their purpose was to create a truly independent judiciary limited only by the cumbersome process of impeachment."[9]

The relevance of Article III's guarantee of an independent judiciary and of the Impeachment Clause to the authority of the judiciary to remove (or discipline) its own members for misconduct is somewhat less certain and has been vigorously debated by lawyers, scholars, and jurists for the last half century.[10] The answer to this question seems to require the resolution of at least two preliminary issues. First, is the constitutional guarantee of an independent judiciary, which is implicit in the promises of life tenure and salary protection under Article III, intended to secure the independence of *individual judges* as well as of the judiciary as an *entity?* Second, if the guarantee is meant to preserve the independence of individual judges, can such independence be maintained without protection against pressure from peers?

I firmly believe that the guarantee of independence runs to individual judges as well as to the judicial branch. Article III's

---

**5.** THE FEDERALIST No. 47, at 324 (J. Madison).

**6.** THE FEDERALIST No. 78, at 523.

**7.** 2 M. FARRAND, THE RECORDS OF THE FEDERAL CONVENTION OF 1787, at 34 (rev. ed. 1966).

**8.** THE FEDERALIST No. 79, at 533.

**9.** Ziskind, *Judicial Tenure in the American Constitution: English and American Precedents*, 1969 SUP.CT.REV. 135, 153.

**10.** *Compare* Kurland, *The Constitution and the Tenure of the Federal Judges: Some Notes from History*, 36 CHI.L.REV. 665 (1969) (contending that impeachment is the *only* constitutional means of removal); Ziskind, *supra* note 9 (same); Fishburn, *Constitutional Judicial Tenure Legislation?—The Words May Be New, But*

*the Song Sounds the Same*, 8 HASTINGS CONST. L.Q. 843, 865–67 (1981) (same); *Chandler v. Judicial Council*, 398 U.S. 74, 129–43, 90 S.Ct. 1648, 1676–83, 26 L.Ed.2d 100 (1970) (Justices Douglas and Black dissenting from the denial of Judge Chandler's petition for a writ of mandamus or prohibition, arguing that the Constitution does not permit the judiciary to discipline its ranks); Ervin, *supra* note 4 (arguing that the judiciary may not constitutionally discipline its members); *and* Kaufman, *The Essence of Judicial Independence*, 80 COLUM.L.REV. 671 (1980) (same, in particular criticizing the Judicial Conduct and Disability Act of 1980), *with* R. BERGER, IMPEACHMENT 122–80 (1973) (arguing that the judiciary may constitutionally remove judges from office, using Article III's good behavior standard as a measure) *and* Shartel, *Federal Judges—Appointment, Supervision, and Removal—Some Possibilities under the Constitution*, 28 MICH.L. REV. 870 (1930) (same).

explicit assurances of life tenure and undiminished salaries pertain directly to individual judges. Moreover, how could the underlying purpose of these assurances—to foster independent decisionmaking—be achieved other than by protecting the independence of individual decisionmakers? Even when judges sit in panels, our confidence in their collective decisionmaking is predicated on the assumption that each judge will make an independent and reasoned evaluation of the issues. If independent decisionmaking is to be protected, then, individual judges must be shielded from coercion.

I am also inclined to believe that in order for Article III's guarantee of independence to be fulfilled, the Constitution must be interpreted to designate impeachment as the *exclusive* mechanism for disciplining or removing federal judges. First, the authors of the Constitution expressly designated impeachment as the means by which federal judges may be removed from office. In view of the Framers' concern for the independence of judicial decisionmaking and the absence of any express constitutional authority on the subject, I can find no warrant for inferring a power in the judiciary to discipline its members or remove judges for misconduct. It seems obvious that judicial independence may "just as easily be eroded by powerful hierarchies within the judiciary itself as by outside pressures from the legislative and executive branches of the government." [11] My concern here is not for the corrupt judge who is annoyed by his or her colleagues' demonstrations of disapproval. My worry is that the provisions of the Act might be subject to abuse—that they might be misused to pressure or intimidate the nonconformist, the judge whose judicial style or legal philosophy are repugnant to the majority of his or her colleagues. As Justice Douglas aptly observed in his dissent in *Chandler v. Judicial Council,*

> [t]he power to keep a particular judge from sitting on a racial case, a church-

and-state case, a free-press case, a search-and-seizure case, a railroad case, an antitrust case, or a union case may have profound consequences. Judges are not fungible; they cover the constitutional spectrum; and a particular judge's emphasis may make a world of difference when it comes to rulings on evidence, the temper of the courtroom, the tolerance for a proferred defense, and the like. Lawyers recognize this when they talk about "shopping" for a judge; Senators recognize this when they are asked to give their "advice and consent" to judicial appointments; laymen recognize this when they appraise the quality and image of the judiciary in their own community.

These are subtle, imponderable factors which other judges should not be allowed to manipulate to further their own concept of the public good.

398 U.S. 74, 137, 90 S.Ct. 1648, 1680, 26 L.Ed.2d 100 (1970).

We cannot fall prey to a natural desire to trust in our own wisdom, good will, and abhorrence of abuse of power. We must "[keep] in mind that tools created by the well-intentioned for beneficient uses may fall into less worthy hands to be used for less appropriate ends." [12]

### III.

In considering specific provisions of the Act, I find significant separation of powers and Impeachment Clause issues arising from the legislative attempt to authorize the judiciary to invoke disciplinary suspensions against individual members found guilty of "misconduct." Likewise, I believe that there may be serious due process questions implicated by the statutory preclusion of judicial review of actions taken against individual judges by the judicial councils and the Judicial Conference of the United States. Finally, I find very troublesome the question whether the Compensation Clause requires the Government to pay

---

**11.** Ervin, *supra* note 4, at 125.

**12.** Kurland, *supra* note 10, at 666.

the legal fees of a judge who is the subject of a complaint under the Act.

### A.

Sections 372(c)(6)(B)(iv) and 372(c)(8) of the Act permit judicial councils and the Judicial Conference to order that, "on a temporary basis for a time certain, no further cases be assigned to any judge or magistrate whose conduct is the subject of a complaint." At oral argument, the court attempted to ascertain whether the suspension provision contained any implicit time limits. When asked whether a judicial council could "temporarily" suspend a judge for fifteen years, counsel for the appellees unhesitantingly responded, "yes." It seems to me that this suspension provision, both on its face and as interpreted by the appellees, poses extraordinarily troublesome separation of powers and Impeachment Clause problems.

Initially, the suspension provision may be an unconstitutional intrusion by Congress into the province of the judiciary. It is true that the Necessary and Proper Clause, U.S. Const. art. I, § 8, cl. 18, enables Congress to provide, to some extent, for the efficient operation of the federal courts. While it is unquestioned that Congress has the power to establish (or authorize the judiciary to establish) purely *administrative*, "housekeeping" procedures—such as procedures for managing dockets and assigning cases—that authority does not necessarily extend beyond such administrative matters. The power of Congress to create procedures for the judiciary is constrained by the separation of powers doctrine and Article III's guarantee of an independent judiciary. I recognize that the reach of legitimate congressional authority is not easily reduced to precise definition, yet surely it must terminate at the point where it affects in any significant way the quintessentially judicial function of *substantive decisionmaking*. By authorizing suspension—the *total* removal of a particular judge's cases—Congress arguably has interfered in the most basic way with a judge's decisionmaking authority. Fur-

thermore, the fact that the appellees contend that Congress may sanction a fifteen-year suspension under the Necessary and Proper Clause suggests that they see no *real* limits on congressional power to meddle in the affairs of the judiciary—other than removal undisguised by another name. I find this expansive reading of congressional authority over the judiciary alarming and worry that if we indulge this particular incursion we will encourage even more intrusive ones.

The separation of powers problem that arises when Congress prescribes for the judiciary more than merely administrative matters is not cured by the contention that the judiciary possesses inherent powers of self-regulation that are coextensive with those delegated by the Act and that therefore Congress, by doing for the judiciary what it could have done for itself, has not intruded in any meaningful way into the domain of the courts. As I noted previously, I am inclined to believe that even the judiciary's inherent powers of self-regulation do not extend beyond purely administrative details. But even assuming that we do have the constitutional power to regulate and discipline our own ranks, it in no way follows that Congress should rely on that power to legislate our procedures for us under the Necessary and Proper Clause. Out of deference to a coordinate branch, we have been reticent to intervene in Congressional affairs that are subject to internal resolution. *See, e.g., Moore v. United States House of Representatives*, 733 F.2d 946, 954–56 (D.C.Cir.1984), *cert. denied*, —— U.S. ——, 105 S.Ct. 779, 83 L.Ed.2d 775 (1985); *Vander Jagt v. O'Neill*, 699 F.2d 1166, 1172–77 (D.C.Cir.), *cert. denied*, —— U.S. ——, 104 S.Ct. 91, 78 L.Ed.2d 98 (1983); *Riegle v. Federal Open Market Committee*, 656 F.2d 873, 881–82 (D.C. Cir.), *cert. denied*, 454 U.S. 1082, 102 S.Ct. 636, 70 L.Ed.2d 616 (1981). Reciprocal respect for the courts suggests that Congress should, and arguably must, be equally reluctant to impose its preferences on the judiciary's governance of its internal affairs.

If counsel for the appellees was correct in asserting that the suspension provision permits suspension of a judge for significant periods of time, I believe that the Act may also unlawfully delegate congressional responsibility under the Impeachment Clause to the judiciary. Suspension for a fifteen year period strikes me as being the functional equivalent of removal. Should effective removal be available through council and Conference proceedings, Congress would retain little incentive to put itself through the cumbersome, time-consuming and painful process of impeachment, which I believe the Framers intended to be the exclusive method of removing federal judges from office. This facile circumvention of the Constitution should not be countenanced.

### B.

The provision of the Act precluding judicial review of council and Conference orders and determinations also poses difficult issues, with regard to both the scope of preclusion and the effect preclusion might have on the constitutionality of the Act's vesting of investigative and adjudicative authority in the councils and Conference.

Section 372(c)(10) provides:

A complainant, judge, or magistrate aggrieved by a final order of the chief judge under paragraph (3) of this subsection [orders dismissing the complaint or concluding the proceedings] may petition the judicial council for review thereof. A complainant, judge, or magistrate aggrieved by an action of the judicial council under paragraph (6) of this subsection [authorizing further investigation and sanctions] may petition the Judicial Conference of the United States for review thereof. The Judicial Conference, or the standing committee ..., may grant a petition filed by a complainant, judge, or magistrate under this paragraph. *Except as expressly provided in this para-*

*graph, all orders and determinations, including denials of petitions for review, shall be final and conclusive and shall not be judicially reviewable on appeal or otherwise.*

(Emphasis added). It is difficult to determine from the text of this provision whether Congress intended to preclude judicial review only of substantive decisions of the councils and Conference or whether it intended, in addition, to preclude review of challenges to the legality of council and Conference decisionmaking processes, such as Judge Hastings' allegation that his right to due process had been infringed upon by the inclusion on the Eleventh Circuit Council's Investigating Committee of judges who were biased against him and who had conspired to drive him from office. The Supreme Court has often noted that " 'only upon a showing of "clear and convincing" evidence of contrary legislative intent should the courts restrict access to judicial review.' " *Lindahl v. Office of Personnel Management,* — U.S. —, 105 S.Ct. 1620, 1627, 84 L.Ed.2d 674 (1985) (quoting *Abbott Laboratories v. Gardner,* 387 U.S. 136, 141, 87 S.Ct. 1507, 1511, 18 L.Ed.2d 681 (1967)). Resolution of the scope of section 372(c)(10)'s preclusion of judicial review will require careful consideration not only of the provision's " 'express language, but also [of] the structure of the statutory scheme, its objectives, its legislative history, and the nature of the administrative action involved.' " *Id.* (quoting *Block v. Community Nutrition Inst.,* 467 U.S. 340, 104 S.Ct. 2450, 2454, 81 L.Ed.2d 270 (1984)). We should be especially cautious in determining that Congress wished to preclude review where such a conclusion would mean, as here, that all judicial review of a constitutional claim would be barred.[13]

If, however, section 372(c)(10) is interpreted to bar all judicial review of claims of

---

**13.** The possibility of discretionary review by the councils and the Conference does not alleviate my concerns regarding the preclusion of judicial review of claims of due process violations. First, a council or the Conference may refuse to hear such a claim. Second, if the claim is that the Conference has violated a judge's right to due process, the Act offers no provision for review.

illegality in the decisionmaking process, including claims of actual bias, the constitutionality of the Act's combination of investigative and adjudicative powers in the same bodies would be called into serious question. It is true, as the appellees note, that in *Withrow v. Larkin* the Supreme Court held that the mere combination of investigative and adjudicative functions in administrative adjudications does not automatically create a *presumption of bias.* 421 U.S. 35, 47, 95 S.Ct. 1456, 1464, 43 L.Ed.2d 712 (1975). The *Withrow* Court, however, assumed that judicial review of claims of *actual bias* was available. *Id.* at 54–55 & n. 21, 95 S.Ct. at 1468–69 & n. 21. *Withrow,* therefore, would not be dispositive of the constitutionality of the Act, should the Act be held to preclude judicial review of claims of actual bias. Under those circumstances due process might require a separation of functions.

### C.

Finally, I am seriously troubled by Judge Hastings' argument that if the Act is interpreted not to provide for Government subsidization of the legal expenses of a judge accused of wrongdoing under that Act, it may violate the Compensation Clause. The purpose of that clause, which states that judges "shall, at stated Times, receive for their Services a Compensation, which shall not be diminished during their Continuance in Office," U.S. Const., art. III, § 1, is to strengthen the independence of the judiciary against Congress. As the Framers understood, *"a power over a man's subsistence amounts to a power over his will."* [14] But if his remuneration be secure, "[a] man may then be sure of the ground upon which he stands, and can never be deterred from his duty by the apprehension of being placed in a less eligible situation." [15]

The standard that federal courts have applied to determine whether an indirect reduction in income, such as that alleged by Judge Hastings, violates the Compensation Clause is that

"[i]ndirect, nondiscriminatory diminishments of judicial compensation, those which do not amount to an assault upon the independence of the third branch or any of its members, fall outside the protection of the Compensation Clause."

*Duplantier v. United States,* 606 F.2d 654, 669 (5th Cir.), *reh'g denied,* 608 F.2d 1373 (1979), *cert. denied,* 449 U.S. 1076, 101 S.Ct. 854, 66 L.Ed.2d 798 (1981) (quoting *Atkins v. United States,* 556 F.2d 1028, 1045, 214 Ct.Cl. 186 (Ct.Cl.1977), *cert. denied,* 434 U.S. 1009, 98 S.Ct. 718, 54 L.Ed.2d 751 (1978)).

Utilizing this standard, the court in *Duplantier* upheld the penalty provisions of the Ethics in Government Act that pertain to federal judges. 28 U.S.C.App. § 304(a). The court observed that in that case there was "no 'plan fashioned by the political branches ... ineluctably operating to punish the judges *qua* judges,'" and emphasized that Congress had imposed precisely the same penalty for failure to file financial reports on members of Congress and on members of the executive branch. 606 F.2d at 669 (quoting *Atkins,* 556 F.2d at 1054). Similarly, in *Atkins,* the Court of Claims held that a seven-year "freeze" on judicial pay during a period of inflation did not offend the Compensation Clause. The court explicitly noted that judges were not the only targets of the freeze; certain other government employees had been included. The court reasoned that

[i]f Congress intended to mount an attack on the independence of the judiciary by means of a salary freeze in the face of high inflation, why would it have included in the freeze the top level civil servants and even, to a lesser extent, its own Members? ... Reasons other than a desire to punish the judges or drive them from office appear to lie behind the 7-year omission of a pay raise.

556 F.2d at 1055–56 (footnote omitted).

By contrast to the congressional action (or inaction) at issue in *Duplantier* and *Atkins,* the Judicial Conduct and Disability Act of 1980 is directed at judges *qua*

---

**14.** THE FEDERALIST No. 79, at 531 (A. Hamilton) (emphasis in original).

**15.** *Id.* at 532.

judges. If the Act were interpreted to preclude Government subsidization of defendant judges' legal expenses, the salaries of individual judges, who are singled out by the complaint process, would be reduced by legal fees. Because the cost of defending against a complaint can be substantial,[16] this reduction may be significant. In considering the Compensation Clause issue, we must again remember that our constitutional concerns lie not with the unsympathetic plight of the corrupt judge who must pay for his or her misdeeds, but with the possibility that the threat of exorbitant defense expenses might chill the independent decisionmaking of a nonconformist judge.

### IV.

Although I have no reason to doubt the integrity of members of the federal judiciary, I am willing to assume that there may be a few corrupt judges, who dishonor their title and role in our society. This does not change my view, however, that the Constitution specifies only one procedure for disciplining them—impeachment. The fact that, in practice, impeachment may be so difficult that unworthy judges are not often removed from office does not give either Congress or the judiciary license to fashion an alternative, more efficient method of dealing with the problem. "Convenience and efficiency are not the primary objectives—or the hallmarks—of democratic government." *Immigration and Naturalization Service v. Chadha*, 462 U.S. 919, 944, 103 S.Ct. 2764, 2781, 77 L.Ed.2d 317 (1983). *Chadha* concerned the constitutionality of the legislative veto; however, many of the Court's observations about the Framers' conscious choice to eschew a certain modicum of efficiency in government in order to preserve higher values are pertinent in this case. In my view, the Framers' choice here was to limit the accountability of individual judges for misconduct to impeachment in order to maximize judicial independence.

To paraphrase the Court in *Chadha*, the choice that I "discern as having been made

in the Constitutional Convention [may] impose burdens on [judicial accountability] that ... seem clumsy, inefficient, even unworkable, but those hard choices were consciously made by men who had lived under a form of government that permitted arbitrary [interference with judicial independence] to go unchecked. There is no support in the Constitution ... for the proposition that the cumbersomeness and delays often encountered in complying with explicit Constitutional standards [*i.e.*, impeachment] be avoided, either by the Congress or by the [judiciary]." *Id.* at 959, 103 S.Ct. at 2788.

An independent judiciary is, as the Framers understood, a principal guarantor of our liberty. We must temper our eagerness to see that only honorable and dedicated women and men fill the judicial ranks with an awareness of the danger to the judiciary of impairing independence and inhibiting diversity of style and opinion among jurists. Should we fail to do so, we may find that "the hope for an independent judiciary will prove to have been no more than an evanescent dream." *Chandler*, 398 U.S. at 143, 90 S.Ct. at 1683 (Black, J., dissenting).

---

**16.** One federal judge reportedly spent $70,000 defending himself against a complaint that ultimately was dismissed. *See* Note, *Unnecessary*

*and Improper: The Judicial Councils Reform and Judicial Conduct and Disability Act of 1980*, 94 Yale L.J. 1117, 1142 (1985).