JUDICIAL REVIEW COUNCIL ET AL. *v.* FREEDOM OF INFORMATION COMMISSION ET AL.

SUPERIOR COURT     JUDICIAL DISTRICT OF     FILE NO. 388355S
HARTFORD-NEW BRITAIN AT HARTFORD

Memorandum filed January 10, 1992

*LaBelle & LaBelle,* for the plaintiffs.

*Catherine Wassel-Nasto,* for the named defendant.

*Tyler, Cooper & Alcorn,* for the defendant Hartford Courant.

*Thomas D. Williams,* pro se, the complainant.

SPADA, J. The named plaintiff, the state judicial review council (JRC), filed an administrative appeal from a decision of the named defendant, the freedom of information commission (FOIC), pursuant to General Statutes §§ 1-21i (d) and 4-183. The JRC seeks to vacate, to set aside, or to modify the FOIC's November 14, 1990 decision ordering the JRC "to henceforth act in compliance with the provisions of Gen. Stats. § 1-19 (a)."[1] That decision concluded that the JRC is a state institution and accordingly, by definition, a "public agency" under General Statutes § 1-18a (a).

The appeal centers on information orally requested on May 15, 1990, by T.D. Williams, a reporter for the defendant Hartford Courant. Williams requested access to the statistics on judicial discipline for 1988 and 1989. Access was denied by the plaintiff executive director

---

[1] The order refers to General Statutes § 1-19a, an obvious typographical error.

of the JRC on the grounds that the 1989 statistics had not yet been compiled and that the compiled 1988 statistics were available at the Center for Judicial Conduct Organization in Chicago (center), where they were transmitted earlier.

The information in dispute consists of: (1) the number of complaints against judges; (2) the number of complaints dismissed before any hearing; (3) the number of complaints that went to preliminary probable cause hearings; (4) the number of complaints that went to public hearings; (5) the general reason in some instances for dismissing complaints summarily; (6) the number of formal investigations; (7) the reasons for dismissals of complaints by the JRC (i.e., no prejudice found; no violation of the judicial code; evidence did not support allegations); (8) the budget for the JRC; and (9) the amount spent to inform the public of the JRC's existence.

Although this appeal raises several questions of law, the dispositive issue, which is one of first impression, is whether the public has access to JRC statistical data prior to its compilation and distribution to the public. The court answers this question in the affirmative.

The JRC is comprised of eleven persons; three superior court judges, three attorneys at law, and five members of the public. The JRC's mission is to contribute to the public's confidence in the integrity of the judicial system by affording a forum for dispatching judicial misconduct.

The JRC has jurisdiction over 235 judges, including all appellate judges, trial judges and family court magistrates. Since its inception on January 1, 1978, the JRC has reviewed 470 complaints. Complaint forms are available at the offices of all court clerks. The complaint process is essentially trifurcated.

Upon receipt, where the available evidence does not disclose possible judicial misconduct, the complaint is dismissed. Eighty percent of all complaints are dismissed during this first stage. Where the evidence indicates an appearance of misconduct, an investigation is conducted to determine whether there is probable cause to believe that judicial misconduct has occurred. This second step is called the private probable cause hearing. General Statutes § 51-51*l* (a). The hearing is private and confidential unless the accused judge elects to have a public hearing. It is evidential, adversarial, and provides a full panoply of due process. When probable cause is not found, the complaint is dismissed; see General Statutes §§ 51-51*l*, 51-51n; notwithstanding a dismissal, the JRC can privately admonish a judge where an appearance of impropriety or an unfavorable judicial practice is uncovered. General Statutes § 51-51*l* (b).

When probable cause is found that judicial misconduct has occurred; see General Statutes § 51-51i; the JRC is required to conduct a public hearing concerning the conduct or complaint in issue. General Statutes § 51-51*l* (c). The procedural rules of due process are accorded the parties at this third stage. If judicial misconduct is not found, the complaint is dismissed; where, however, judicial misconduct is found at the public hearing stage, the JRC can impose one of four sanctions as prescribed under General Statutes § 51-51n. These sanctions include public censure, suspension not to exceed one year, and recommendations to the state Supreme Court for suspension in excess of one year or removal from office.

The JRC has distributed three reports to the public since January 1, 1978. Its most recent, the third report, covers the period from January 1, 1986, to December 31, 1989. A total of 143 complaints were filed during that quadrennial. The JRC is an affiliate mem-

ber of the center. Each year, the JRC compiles the statistics from the previous year and transmits them to the center. At that juncture, the compiled data is made accessible to the public. The JRC "subscribes to the Center's index of cases, submits statistics annually and receives invaluable assistance by way of periodic conferences, newsletters, research and case digests on judicial discipline and disability law."

The JRC's policy of attempting to bolster confidence in the judiciary by precluding access to uncompiled statistical data is laudable but not supportable. The third report declares that "[i]t is therefore critical that judges be protected from the publication of unfair, unwarranted or false accusations of judicial misconduct." The executive director of the JRC stated: "[T]he legitimate state interest that [is] involved here is not having the judiciary tarred with unsubstantiated or frivolous complaints. It is very important to the prestige . . . the public has, about our judiciary." Williams' request did not violate the announced JRC policy, rather, it sought information that is distributed annually and quadrennially to the public. Sufficient statutory confidentialities and JRC practices are in place to protect the judiciary from wholesale frivolous and ungrounded complaints. General Statutes § 51-51*l* (a).

Resolution of the present issue requires an analysis of whether the JRC is a "public agency" as found by the FOIC. The JRC contends that it is not a public agency. The JRC contends further that "it is independent of all three branches of the government" and, that if it does belong to a branch of the government, it is to the judicial branch.

The JRC's contention that it is outside any of the three branches of government is predicated on its being

specially established by the state constitution. The executive director of the JRC stated: "The Council takes the position that this is a constitutionally established body. And the theory behind it is that it is not a part of the Executive Department, it is not obviously part of the Legislative Department and it certainly doesn't want to be a part of the Judicial Department. We're not in the judiciary although there happen to be some judges [who are] members of the Council. It's a hybrid organization; it's completely out here separate. It has a lot of power. It can suspend judges, it can put people in jail for contempt; it can do a lot of things. So that of the three branches of government, [it is] not part of any of them because they are completely independent by constitution."

The JRC's claim that it is established by constitutional amendment and, accordingly, is a "constitutionally established body" is impaired. This contention is rooted in the belief that the JRC is derived from the state constitution, article fifth, § 7, which provides: "The General Assembly may establish a judicial review council which may also, in such manner as shall by law be prescribed, censure any such judge, or suspend any such judge for a definite period not longer than one year." This constitutional nascense occurred on November 24, 1976, by enactment of article eleventh of the amendments to the constitution.

Public Acts 1977, No. 77-494, created a functioning judicial review council, effective January 1, 1978. The framework for the removal, suspension and censure of judges is set out in chapter 872a of the General Statutes. See General Statutes §§ 51-51g through 51-51u. As noted in the third report, "[i]t is . . . self-evident that the existence of the Judicial Review Council *by virtue of the statutory powers invested in it* exerts a powerful influence on members of the judiciary." (Emphasis

added.) As a creation of the General Assembly the JRC, accordingly, can be disestablished by the General Assembly. This is not the hallmark of constitutional genesis.

The JRC is not so much constitutionally established as it is constitutionally referenced. The constitution authorizes the General Assembly, if it so elects, "to establish a judicial review council." Conn. Const., art. V, § 7. Profound questions of constitutional import are raised because the JRC is a judiciary oversight agency. A search of the legislative history failed to disclose any hint of whether article fifth, § 7, was intended to avoid a constitutional impasse between the constitutional distribution of powers of article second and subsequent legislative enactments implementing article fifth, § 7.

The constitutional distribution of powers provides that: "The powers of government shall be divided into three distinct departments, and each of them confided to a separate magistracy, to wit, those which are legislative, to one; those which are executive, to another; and those which are judicial to another. . . ." Conn. Const., art. II, as amended by art. XVIII of the amendments.

Because the membership composition of the JRC, its powers, its jurisdiction, its procedure and process, and its sanctions are all regulated and prescribed by the General Assembly; see General Statutes §§ 51-51i, 51-51j, 51-51l, 51-51m and 51-51n; grave constitutional questions are raised as to whether these legislative enactments can meet the distribution of powers requirements of article second.

At argument, in response to a question from the bench, counsel for the FOIC posited that article fifth, § 7 was constitutionally at variance with article second. Whether the establishment clause of article fifth, § 7, is in conflict with article second is an issue postponed for another day before a higher tribunal. For purposes

of this appeal, it is not essential that this issue be decided. "It is an established and salutary principle of the law of federal courts that constitutional issues affecting legislation will not be determined 'in advance of the necessity of deciding them. . . .' " *Hastings* v. *Judicial Conference of the United States,* 770 F.2d 1093, 1100 (D.C. Cir. 1985).

It is not uncustomary to examine the federal system for guidance in matters of first impression. The federal judiciary has a judicial conference for oversight of judges, established by the Judicial Councils Reform and Judicial Conduct and Disability Act of 1980 (act), 28 U.S.C. § 331. The conference is composed of the chief judges of all the circuits plus a designated district judge from each circuit and is presided over by the Chief Justice. The justification for accepting congressional legislation in this area is the exclusive control reserved by the judiciary. " 'The judiciary has the inherent power to govern itself in a manner that will achieve these ends.' The Act 'represents a legitimate exercise of Congress's "necessary and proper" power to effectuate that judicial power.' Rather than intrude on judicial independence, Congress 'was simply recognizing the need to give the courts reasonable means to put the judiciary's own house in order.' " *Hastings* v. *Judicial Conference of the United States,* supra, 1098, citing approvingly to Judge Gessel's remarks at the trial level. Cf. *Hastings* v. *Judicial Conference of the United States,* 593 F. Sup. 1371 (D.D.C. 1984).

The act is viewed as the need for some means by which federal judges might "put their own house in order." *Chandler* v. *Judicial Council,* 398 U.S. 74, 85, 90 S. Ct. 1648, 26 L. Ed. 2d 100 (1970). The concurring opinion of Circuit Judge Edward in *Hastings,* stated: "In light of our long tradition of an independent judiciary that has been largely free from legislative tampering, it is ironic that, in 1985, a member of

the federal judiciary is being tried under an act of Congress that purports to define judicial misconduct and to authorize sanctions—short of actual removal—against offending judges. What is even more curious to me is the apparently unquestioning acceptance by the judiciary of an act that may, in part, be significantly at odds with our basic constitutional structure and previously inviolate principles of separation of powers. My concern . . . has less to do with issues of individual misconduct than with a potential unconstitutional legislative incursion into the judicial province." *Hastings* v. *Judicial Conference of the United States*, supra, 770 F.2d 1104–1105.

In sister states where judicial boards have been constitutionally established to include the presence of individuals who are not judges, those boards have been viewed as prosecutorial agencies with the adjudication and imposition of sanctions referred either to the state's Supreme Court or to a commission composed solely of judges. *First Amendment Coalition* v. *Judicial Inquiry & Review Board,* 784 F.2d 467 (3d Cir. 1986); see *Pincham* v. *Illinois Judicial Inquiry Board,* 681 F. Sup. 1309 (N.D. Ill. 1988).

An ancillary though not dispositive issue raised by these pleadings is to what branch of government does the JRC belong? Its contention that it is a hybrid agency has merit. The JRC investigates and adjudicates pursuant to § 51-51*l*, thus performing both executive and legislative functions. A plethora of governmental agencies likewise have cross-over functions. Hybrid operations, however, are not the mantelpiece for a fourth branch of government. No authority is cited in the JRC brief to support its assertion that it is outside the three branches of government.

The distribution of governmental powers is confided to the three branches of government. Conn. Const., art.

II. "Since all the powers initially residing in the people were granted to these three departments of state government, no additional powers remained to be distributed." *Stolberg* v. *Caldwell,* 175 Conn. 586, 597, 402 A.2d 763 (1978), appeal dismissed sub nom. *Stolberg* v. *Davidson,* 454 U.S. 958, 102 S. Ct. 496, 70 L. Ed. 2d 374 (1981). "[T]he language of the constitution of Connecticut controverts any intention to provide for a distribution of powers of government to a separate, fourth magistracy of government outside those three clearly defined in article second . . . . While it is often true that the powers granted to the departments of government necessarily overlap to some extent; and that the concept of separation of powers is not one that is capable of precise legal definition yielding clear solutions to intragovernmental disputes; neither this apparent commingling of functions and duties nor the potential for any uncertainty compels us to conclude that a new and separate branch of government has been created." *Stolberg* v. *Caldwell,* supra, 596.

If this court were to conclude that the JRC belonged to either the legislative or executive branches, then the JRC would be by definition a "public agency." General Statutes § 1-18a (a). No such conclusions need be reached in this decision. If this court were to conclude that the JRC was a part of the judicial branch, then the JRC's liability to the Freedom of Information Act would be "only in respect to its or their administrative functions." General Statutes § 1-18a (a). The resolution of this appeal, however, does not require a decision as to which branch of government the JRC belongs. Inclusion in the legislative or executive branches of government would by definition render the JRC a public agency; inclusion in the judicial branch would raise grave challenges to the constitutionality of chapter 872a of the General Statutes.

It is undisputed that if the keeping and maintaining of the contested statistical data constitutes an "administrative function," then it is a public record regardless of the branch of government to which the JRC is appended.

The JRC contends in its brief that "[p]ublic agencies have no obligation to compile the statistical information simply because it is requested. When a public record exists, it is available to a member of the public filing a proper request. However, the agency has no duty to create a public record simply because a request is filed, even if the agency would normally create the record at a later time." No authorities are cited in support of this statement.

In *Maher* v. *Freedom of Information Commission,* 192 Conn. 310, 472 A.2d 321 (1984), the contention of the department of income maintenance that records maintained should not be interpreted to require providing information or records not readily available was rejected. Although *Maher* dealt with computer storage systems; see General Statutes § 1-19a; the Supreme Court required a printout of any data properly identified. The present appeal is closely analagous to *Maher* wherein the Supreme Court found no distinction under § 1-19a between compiled and uncompiled data.

In *Gold* v. *McDermott,* 32 Conn. Sup. 583, 347 A.2d 643 (1975), the appellate session of the Superior Court required access to raw data compiled by a local assessor. Although the court dealt with Connecticut's right to know statute (then General Statutes § 1-19), the antecedent of § 1-19 (a), the critical language "all records made, maintained or kept on file" is not dissimilar. "There is nothing in the language of § 1-19 of the General Statutes indicating that a document must be connected with an official or completed transaction to be a public record." Id., 588. The JRC's claim that it

"acts only as an investigatory or adjudicatory body," belies its important function of keeping and monitoring records of all complaints, their subject matter and their resolution.

The Freedom of Information Act was intended to cover all branches of government, including the judicial branch insofar as the administrative functions of that branch are concerned. "We believe it is appropriate to confine 'administrative functions' in § 1-18a (a) to matters relating to the management of the internal institutional machinery of the court system." *Rules Committee of the Superior Court* v. *Freedom of Information Commission,* 192 Conn. 234, 243, 472 A.2d 9 (1984). This is the controlling definition of "administrative functions." Id.

Keeping or maintaining data is not related to either substantive or procedural issues. In *Rules Committee,* reference was made to General Statutes §§ 51-5a and 51-9, statutes describing the duties of the chief court administrator and the executive secretary. Id., 244, n.13. "Those statutes speak mainly to the accounting, personnel, scheduling and record-keeping activities of the Judicial Department." Id., 246. The referenced statutes set out the duty to collect and compile statistical and other data concerning the business transacted by the judicial branch.

Although the Supreme Court neither specifically labeled each of the enumerated tasks as either administrative or nonadministrative, nor addressed the legislative authority to delineate the function of the chief court administrator or the executive secretary, the opinion described some of the referenced duties as "further examples of administrative tasks." Id., 245–46. It recognized that certain duties performed by judicial officers such as accounting, personnel scheduling and *record keeping,* some of which are detailed in § 51-5a, are administrative tasks. Id., 246.

"The general rule, under the act, however, is disclosure. General Statutes § 1-19. Exceptions to that rule will be narrowly construed in light of the underlying purpose of the act; and the burden of proving the applicability of an exemption rests upon the agency claiming it." *Wilson* v. *Freedom of Information Commission,* 181 Conn. 324, 329, 435 A.2d 353 (1980). The maintenance of statistical data is not a record of a preliminary, deliberative and predecisional process that the exemption in General Statutes § 1-19 (b) (1) was intended to protect. Id., 333.

The JRC itself acknowledges that these disputed records are "non-confidential statistics." The executive director conceded that the compiled statistical data constituted public records: "It was information that could eventually be released to the public. If it had been filed at Chicago, which is done annually, it was available to him whenever he called me and I would give it to him. The [JRC] will not release them until they had been sent to Chicago or until our report came out."

The contention that there is a difference between uncompiled and compiled statistical data appears to be a distinction without a difference. The compilation of data does not change otherwise inaccessible data into accessible data. The authorities are to the contrary. See *Maher* v. *Freedom of Information Commission,* supra. When information is recognized as part of the public record, it is so nascently and not because of some maturation process. Once data is conceded as "non-confidential" and eventually accessible to the public, then § 1-19 (a) does not reserve to the keeper the power to decide when such data may be released to the public. The JRC's concerns that "to hold otherwise would require the dissemination of statistical information not fully reviewed, checked and approved for release by the agency," are meritorious and sympathetic.

These concerns, on balance, must yield, however, when the right to public access outweighs the minimal risks attendant to the requirement of accuracy. In the prior quadrennial, the JRC received 143 complaints or an average of three complaints per month. The JRC objects to "chang(ing) its long standing procedures for the compilation and release of statistical information to suit the wishes of a particular individual." Although § 1-19 (a) provides for "the right to inspect such records promptly," counsel for the FOIC acknowledged at argument that the FOIC policy is to treat "promptly" as "reasonably." It would appear to be minimally burdensome for the executive director to compile statistics monthly, to submit them for accuracy approval to the JRC, and thereafter to make them available on a monthly accumulative basis for inspection by the public. This would achieve disclosure without undue infringements on the otherwise excellent performance of the JRC and bring the JRC into compliance with § 1-19 (a).

This court concludes that, whether compiled or not, the keeping and maintaining by the JRC of the records resulting from the presentment of complaints against judges constitutes an "administrative function." The disputed data is disseminated annually to the public. The JRC acknowledges that the maintenance of these records is essential to its viability as a judicial oversight agency. Accordingly, compliance is ordered under § 1-19 (a), consistent with this opinion.

Both briefs address functional equivalency in support of their respective positions as to whether the JRC is a "public agency" within the meaning of § 1-18a (a). It is not essential for the resolution of this appeal that the court decide whether the JRC is the functional equivalent of a public agency. Analysis of the functional equivalency yardsticks requires an entity owned privately in part and receiving public funds or discharg-

ing public functions. Cases submitted by both parties not unexpectedly involve privately owned entities. The JRC is not privately owned. Its entire appropriation comes from the public treasury and its budget is integrated into the state comptroller's budget. The JRC is further subject to auditing by the state's auditors. Functional equivalency is inapposite to the issue on appeal.

In its brief the JRC raised for the first time the issue that Williams had not submitted his request in writing in violation of General Statutes § 1-15. This matter was neither raised nor contested by the JRC at the FOIC hearing. Consequently the FOIC did not address this issue in its findings. The FOIC is correct that an issue not raised at the agency level leaves this court without jurisdiction to act. *Concerned Citizens of Sterling* v. *Sterling,* 204 Conn. 551, 529 A.2d 666 (1987). Even if the court assumes that there was merit to the timeliness of this issue, the question before this court is access to public records under § 1-19 (a). Access to records requires no written requests under § 1-19 (a). The issue at this late stage obfuscates the appeal.

This court concludes that the JRC, its members and executive director have a specific and personal interest in the validity of the FOIC's decision, and are accordingly aggrieved by its order.

The JRC in its appeal does not contest paragraphs one, two, three, four, five, seven, nine, twelve, thirteen, fourteen, sixteen, seventeen, eighteen and nineteen of the commission's factual findings. The items in dispute are paragraphs six, eight, ten, eleven, fifteen and twenty of the findings.

The court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact. The court may reverse or modify a decision if it finds that the decision is: "In violation of

constitutional or statutory provisions . . . clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or . . . arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion. . . ." General Statutes § 4-183 (j).

This court concludes that the evidence supports the FOIC's findings in paragraphs six and twenty; as to paragraph eleven, the evidence established that the JRC conceded that only the compiled data constituted a public record; as to paragraph fifteen, the issue is moot in view of this decision; as to paragraphs eight and ten, consistent with this opinion, it is not essential for the resolution of this appeal to conclude that the JRC is a public agency by nature of being a state institution.

The appeal is dismissed. The JRC is ordered, in reference to uncompiled or compiled data, to act in compliance with § 1-19 (a), consistent with the requirements of this opinion.