CONCERNED CITIZENS OF STERLING ET AL. *v.*
TOWN OF STERLING
(13123)

PETERS, C. J., HEALEY, SHEA, GLASS and COVELLO, JS.

Argued June 2—decision released August 4, 1987

*Kathleen Eldergill,* for the appellants (named plaintiff et al.).

*John K. Harris, Jr.,* town attorney, for the appellee (defendant).

ARTHUR H. HEALEY, J. The dispositive issue on this appeal is whether the plaintiffs, the Concerned Citizens of Sterling et al., were required to exhaust their administrative remedies before filing their action for injunctive relief in the Superior Court. The named plaintiff is a nonprofit citizens' organization composed of citizens, taxpayers and residents of the town of Ster-

ling.[1] The defendant, the town of Sterling, is a Connecticut municipality that owns an industrial park, known as the Town of Sterling Industrial Park.[2]

The background facts are not in dispute. In late January, 1986, town officials announced that a company known as Oxford Energy, Inc., wanted to purchase twenty acres of land in the Town of Sterling Industrial Park for the purpose of building a tire-to-energy plant. The plaintiffs petitioned for a referendum on that question pursuant to General Statutes § 7-7.[3] On

---

[1] Two individual members of the Concerned Citizens of Sterling, Frank Bauer and Glenn Shiffer, were also original plaintiffs in this action. The Concerned Citizens of Sterling and Glenn Shiffer have filed this appeal. Frank Bauer is not a party to this appeal.

[2] This land can be sold only upon approval of the residents and voters of the town of Sterling.

[3] General Statutes (Rev. to 1985) § 7-7 provides: "CONDUCT OF MEETING OF MUNICIPAL CORPORATIONS. VOTE BY BALLOT OR VOTING MACHINE; WHEN. All towns, when lawfully assembled for any purpose other than the election of town officers, and all societies and other municipal corporations when lawfully assembled, shall choose a moderator to preside at such meetings, unless otherwise provided by law; and, except as otherwise provided by law, all questions arising in such meetings shall be decided in accordance with standard parliamentary practice, and towns, societies and municipal corporations may, by ordinance, adopt rules of order for the conduct of their meetings. At any such town meeting the moderator shall be chosen from the last-completed registry list of such town. Two hundred or more persons or ten per cent of the total number qualified to vote in the meeting of a town or other municipal corporation, whichever is less, may petition the clerk or secretary of such town or municipal corporation, in writing, at least twenty-four hours prior to any such meeting, requesting that any item or items on the call of such meeting be submitted to the persons qualified to vote in such meeting not less than seven nor more than fourteen days thereafter, on a day to be set by the town meeting or, if the town meeting does not set a date, by the town selectmen, for a vote by paper ballots or by a Yes or No vote on the voting machines, during the hours between twelve o'clock noon and eight o'clock p.m.; but any municipality may, any provision of any special act to the contrary notwithstanding, by vote of its legislative body provide for an earlier hour for opening the polls but not earlier than six o'clock a.m. The selectmen of the town may, not less than five days prior to the day of any such meeting, on their own initiative, remove any item on the call of such meeting for submission to the voters in the manner provided by this section or may submit any item which,

February 22, 1986, a referendum was held and the voters of Sterling rejected the proposed sale.

Thereafter, certain residents of Sterling filed an application with the town selectmen, pursuant to General Statutes § 7-1,[4] requesting that a special town meeting be held for the purpose of reconsidering the proposed sale. On March 13, 1986, the board of selectmen published notice of a town meeting on March 20, 1986, and indicated that the board had voted to remove the proposed sale from the meeting agenda and submit it to a referendum vote to be held on March 27,

in the absence of such a vote, could properly come before such a meeting to the voters at a date set for such vote or along with any other vote the date of which has been previously set. The paper ballots or voting machine ballot labels, as the case may be, shall be provided by such clerk or secretary. When such a petition has been filed with such clerk or secretary, the moderator of such meeting, after completion of other business and after reasonable discussion, shall adjourn such meeting and order such vote on such item or items in accordance with the petition; and any item so voted may be rescinded in the same manner. If such moderator resigns or is for any other cause unable to serve as moderator at such adjourned meeting, such clerk or secretary shall serve, or may appoint an elector of such municipality to serve, as moderator of such adjourned meeting. Such clerk or secretary, as the case may be, shall phrase such item or items in a form suitable for printing on such paper ballots or ballot labels. The vote on any item on the call of a town or other municipal corporation shall be taken by paper ballot if so voted at the meeting, if no petition has been filed under this section with reference to such item."

[4] General Statutes § 7-1 provides: "ANNUAL AND SPECIAL TOWN MEETINGS. HOLDING OF MEETINGS OUTSIDE TOWN. (a) Except as otherwise provided by law, there shall be held in each town, annually, a town meeting for the transaction of business proper to come before such meeting, which meeting shall be designated as the annual town meeting. Special town meetings may be convened when the selectmen deem it necessary, and they shall warn a special town meeting on application of twenty inhabitants qualified to vote in town meetings, such meeting to be held within twenty-one days after receiving such application. Any town meeting may be adjourned from time to time as the interest of the town requires.

"(b) Where any town's public buildings do not contain adequate space for holding annual or special town meetings, any such town may hold any such meeting outside the boundaries of the town, provided such meetings are held at the nearest practical locations to the town."

1986. At the March 27 referendum, the voters approved the sale of land to Oxford Energy, Inc.

On April 3, 1986, the plaintiffs filed a complaint in the Superior Court seeking permanently to enjoin the defendant from "taking any action to effectuate the sale of land in the Sterling Industrial Park." The plaintiffs claimed that the March 27 referendum was illegal for the following reasons: (1) the earlier referendum vote on February 22, 1986, had not been rescinded in the same manner as voted, in violation of General Statutes § 7-7; (2) the municipal clerk had failed to issue a warning or a notice of the referendum held on March 27, 1986, as required under General Statutes § 7-9c;[5] and (3) the town of Sterling's conduct between the first and second referendum improperly had exerted undue influence upon the privilege of free suffrage of the citizens of Sterling in violation of article sixth, § 4, of the Connecticut constitution. The improper conduct alleged by the plaintiffs is that the town, during the period of February 23, 1986, through March 27, 1986, had prepared and distributed informational materials and explanatory texts which advocated the approval of the referendum question. The plaintiffs also alleged that town funds, facilities and materials had been used to prepare and distribute this information.

---

[5] General Statutes § 7-9c provides: "DATES AND HOURS OF REFERENDA. Unless otherwise provided by law, a referendum on any question may be held on such date as the legislative body of the political subdivision holding such referendum shall determine and at such hours as is provided in section 7-9b; provided any such referendum shall be held not earlier than the thirtieth day following the day upon which the municipal clerk, upon instruction from the legislative body, issues a warning therefor by publishing a notice thereof in a newspaper having a general circulation in the municipality, and provided, if any question is to be submitted at an election as that term is defined in section 9-1, the provisions of sections 9-369, 9-369a and 9-370 shall apply. The provisions of this section shall not apply to votes scheduled pursuant to petitions filed under section 7-7."

The plaintiffs, claiming irreparable harm and no adequate remedy at law, requested that the town be enjoined from taking any action to effectuate the sale of the land to Oxford Energy, Inc., and also requested "[s]uch other and further relief as [the trial] court deem[ed] just and proper."

The defendant filed a motion to dismiss on May 21, 1986, asserting that the trial court lacked jurisdiction to interfere with a legislative action of the town and because the plaintiffs lacked standing to challenge such legislative action. The defendant also argued that the trial court lacked jurisdiction because the plaintiffs had failed to exhaust the administrative remedies provided by General Statutes § 9-7b. The trial court granted the defendant's motion to dismiss, holding that the plaintiffs lacked standing to maintain the action.[6]

On September 30, 1986, the plaintiffs appealed claiming, inter alia, that the trial court erred in concluding that the plaintiffs lacked standing. At oral argument in this court, the plaintiffs conceded that as of the date this action was filed in the trial court, they had not yet filed a complaint with the state elections enforcement commission (the commission).[7] We note that the plain-

---

[6] The trial court did not rule on the exhaustion issue but granted the defendant's motion to dismiss solely on the basis of lack of standing.

[7] General Statutes (Rev. to 1985) § 9-7b (1), as amended by Public Acts 1985, No. 85-489, § 1, provides: "(Formerly Sec. 9-368b). STATE ELECTIONS ENFORCEMENT COMMISSION'S DUTIES AND POWERS. The state elections enforcement commission shall have the following duties and powers:

"(1) To make investigations on its own initiative or with respect to statements filed with the commission by the secretary of the state or any town clerk, or upon written complaint under oath by any individual, with respect to alleged violations of any provision of the general statutes pertaining to or relating to any election, any primary held for the purpose of selecting a nominee for public office or any referendum, and to hold hearings when the commission deems necessary to investigate violations of any provisions of the general statutes pertaining to or relating to any such election, primary or referendum, and for the purpose of such hearings the commission may administer oaths, examine witnesses and receive oral and documen-

tiffs did file a complaint with the commission twenty-six days after this action had been initiated in the Superior Court.

" 'It is a settled principle of administrative law that, if an adequate administrative remedy exists, it must be exhausted before the Superior Court will obtain jurisdiction to act in the matter. *Connecticut Life & Health Ins. Guaranty Assn.* v. *Jackson,* 173 Conn. 352, 358–59, 377 A.2d 1099 (1977); *State ex rel. Golembeske* v. *White,* 168 Conn. 278, 282, 362 A.2d 1354 (1975); see 3 Davis, Administrative Law § 20.01; General Statutes §§ 4-175, 4-183.' *Connecticut Mobile Home Assn., Inc.* v. *Jensen's, Inc.,* 178 Conn. 586, 588, 424 A.2d 285 (1979)." *Cummings* v. *Tripp,* 204 Conn. 67, 75, 527 A.2d 1230 (1987).

Because the exhaustion doctrine implicates subject matter jurisdiction, we must decide as a threshold matter whether that doctrine requires dismissal of the plaintiffs' claim. The issue of subject matter jurisdiction can be raised at any time including on appeal.

tary evidence, and shall have the power to subpoena witnesses under procedural rules the commission shall adopt, to compel their attendance and to require the production for examination of any books and papers which the commission deems relevant to any matter under investigation or in question. In connection with its investigation of any alleged violation of any provision of Chapter 144a or 145, or of any provision of section 9-359 or section 9-359a, the commission shall also have the power to subpoena any municipal clerk and to require the production for examination of any absentee ballott, inner and outer envelope from which any such ballot has been removed, depository envelope containing any such ballot or inner or outer envelope as provided in sections 9-150 and 9-153, and any other record, form or document as provided in section 9-153, in connection with the election, primary or referendum to which the investigation relates. In case of a refusal to comply with any subpoena issued pursuant to this subsection or to testify with respect to any matter upon which that person may be lawfully interrogated, the superior court for the judicial district of Hartford-New Britain, on application of the commission, may issue an order requiring such person to comply with such subpoena and to testify; failure to obey any such order of the court may be punished by the court as a contempt thereof."

"Once brought to the attention of the court, regardless of the form of the motion, it must be acted upon." *Cahill* v. *Board of Education,* 198 Conn. 229, 238, 502 A.2d 410 (1985) *(Cahill II); East Side Civic Assn.* v. *Planning & Zoning Commission,* 161 Conn. 558, 559, 290 A.2d 348 (1971); *Carten* v. *Carten,* 153 Conn. 603, 610, 219 A.2d 711 (1966). "Moreover, ' "whenever a court discovers that it has no jurisdiction, it is bound to dismiss the case, without regard to its previous rulings." ' *Chzrislonk* v. *New York, N.H. & H. R. Co.,* 101 Conn. 356, 358, 125 A. 874 (1924)." *Cahill II,* supra. If the trial court had no jurisdiction because the plaintiffs had failed to exhaust their administrative remedies, the action must be dismissed.

The doctrine of exhaustion is grounded in a policy of fostering an orderly process of administrative adjudication and judicial review in which a reviewing court will have the benefit of the agency's findings and conclusions. *Connecticut Life & Health Ins. Guaranty Assn.* v. *Jackson,* supra, 358–59. "The doctrine of exhaustion 'furthers the salutary goals of relieving the courts of the burden of deciding questions entrusted to an agency . . . in advance of possible judicial review.' *Watergate II Apartments* v. *Buffalo Sewer Authority,* 46 N.Y.2d 52, 57, 385 N.E.2d 560, 412 N.Y.S.2d 821 (1978)." *Cahill II,* supra, 242.

The plaintiffs argue that their request for injunctive relief was properly before the trial court because a party is not required to exhaust an administrative remedy that is inadequate. Specifically, the plaintiffs maintain that the available administrative remedy, initiated by filing a complaint with the state elections enforcement commission, is inadequate because under General Statutes § 9-7b (8),[8] the commission has no obligation

---

[8] General Statutes § 9-7b provides: "The state elections enforcement commission shall have the following duties and powers . . . . (8) To refer

to refer the matter to the attorney general for injunctive relief and, even if the matter is referred to the attorney general, the attorney general has no *obligation* to seek the injunctive relief requested. The plaintiffs argue that because the commission itself has no power to seek an injunction, the administrative remedy necessarily is inadequate to redress their complaint. Although we agree that a party is not required to exhaust an inadequate administrative remedy, we disagree with the plaintiffs' characterization of their administrative remedy in this case as inadequate.

The administrative process that the plaintiffs claim is inadequate is set forth in General Statutes § 9-7b. This lengthy statute outlines the powers and duties of the commission. Under the statute, the commission has considerable power to make investigations, including the ability to hear witnesses, to review written documents, and to use subpoena power. The commission is authorized, inter alia, to levy civil penalties for various violations, to order repayment of funds spent improperly, to refer to the chief state's attorney evidence of various election law violations for possible criminal prosecutions, and to refer to the attorney general any "evidence" of violations requiring injunctive or other ancillary equitable relief. General Statutes § 9-7b (1), (2), (3), (7) and (8).

Although, under the statute, the commission itself does not have the power to seek injunctive relief, it does have the power and duty "[t]o refer to the attorney general evidence for injunctive relief . . . ." General Statutes § 9-7b (8). The legislative history of that provision indicates clearly that the procedure of referring to the attorney general a request for injunctive relief was set up as a mechanism to avoid creating a legal

---

to the attorney general evidence for injunctive relief and any other ancillary equitable relief in the circumstances of subdivision (7) of this section."

staff solely for the commission.[9] The procedure envisioned by the legislature is that in any case where the commission has evidence indicating a violation of state election laws, it has the power and the duty, in appropriate cases, to refer this evidence to the attorney general who is authorized to seek injunctive relief.

In arguing that the administrative remedy is inadequate, one scenario presumably envisioned by the plaintiffs is that the commission would find serious error in an election process, but the attorney general would refuse, for one reason or another, to seek the injunctive relief requested. Another situation is that the commission itself would refuse to turn over evidence to the attorney general even though it had found an obvious violation of the election laws. First of all, these scenarios are not in accord with the facts as pleaded in this case. Moreover, by bypassing the administrative remedy, the plaintiff has not only "deprived [the administrative body] of the opportunity to hear, analyze and review a matter within its responsibility and expertise, but [has] also deprived [itself] of the opportunity to put on [its] case and to make a proper record on which to seek judicial relief . . . ." *Cahill, II,* supra, 241–42.

Although we do not require a party to pursue an administrative remedy that is futile, we have never held that the mere possibility that an administrative agency may deny a party the specific relief requested is a ground for an exception to the exhaustion requirement.

---

[9] Senator Richard S. Scalo indicated one reason for this procedure: "[R]ather than create its own legal staff . . . when the Commission seeks to have injunctive relief entered in terms of illegal activities occurring within the state of Connecticut, it can call upon the office of the Attorney General to present these issues in the court." 17 S. Proc., Pt. 5, 1974 Sess., pp. 1964–65. Thus, it appears the decision to have the commission refer "evidence" to the attorney general was one of convenience and efficiency, not a desire to limit the commission's ability to provide relief to aggrieved parties.

Id., 243. In our cases, we have held that futility is more than a mere allegation that the administrative agency might not grant the relief requested. In most instances, we have held that the failure to exhaust an administrative remedy is permissible only when the administrative remedy would be useless. For example, in *Cahill II,* supra, we held that a mere claim of probable bias was insufficient to avoid the exhaustion doctrine. Id., 242. By contrast, in *Dukes* v. *Durante,* 192 Conn. 207, 223–24, 471 A.2d 1368 (1984), the plaintiffs sought injunctive relief based on the defendants' failure to provide adequate housing. We concluded that, in light of the statute limiting the agency's power to determinations of "eligibility for relocation payments," resort to the agency would have been futile.[10] Similarly, in *Cahill* v. *Board of Education,* 187 Conn. 94, 444 A.2d 907 (1982) *(Cahill I),* we held that an appeal from a decision by the defendant board was not necessary because the administrative agency had no power whatsoever to deal with the dispute in question. Id., 103–104.

This case does not present the situation sometimes found in zoning cases where we have permitted an exception to the exhaustion requirement. *Reynolds* v.

---

[10] In support of their claim that exhaustion is not required, the plaintiffs point to language in *Dukes* v. *Durante,* 192 Conn. 207, 223, 471 A.2d 1368 (1984), that states that exhaustion is not required when "the relief sought is equitable and the administrative agency has no power to compel such relief." Despite this language, the facts of the *Dukes* case disclose that it does not support the plaintiffs' contention. In *Dukes,* the administrative remedy provided under General Statutes § 8-278 was limited to determinations of "eligibility for relocation payments." The plaintiffs in that case sought injunctive relief because the defendants had failed to provide decent, safe and adequate housing. We concluded that because the commission was authorized to determine eligibility for relocation payments only, any claim made to that agency for injunctive relief would have been futile and thus excused the plaintiffs' failure to seek relief from the administrative agency. In this case, however, unlike *Dukes,* the available administrative procedure does provide the plaintiffs with a mechanism for attaining the remedy that they seek.

*Soffer,* 183 Conn. 67, 71–72, 438 A.2d 1163 (1981); *Blum* v. *Lisbon Leasing Corporation,* 173 Conn. 175, 180, 377 A.2d 280 (1977). This exception requires that a plaintiff make allegations that a zoning violation has resulted in special damage to an individual. *Cummings* v. *Tripp,* supra, 77–78. The type of harm alleged here is not analogous to the specific harm suffered by a violation of a zoning ordinance where injunctive relief from a court may be a more appropriate remedy. The type of harm alleged by the plaintiffs in this case is a generalized injury suffered by all the voters and taxpayers of the town. This is precisely the type of harm that the commission was designed to combat. Although this harm is suffered generally by all voters in a particular election, no voter is denied a right to contest the election since the written complaint of only one person is enough to trigger the agency's investigatory powers.

At oral argument, the plaintiffs relied heavily on *Brainard* v. *West Hartford,* 140 Conn. 631, 103 A.2d 135 (1954), where we held that an appeal to a public authority that was not bound to redress private grievances was an inadequate remedy. The crucial distinction there was that the private complainant was appealing to a board that was authorized only to act in the interests of the public convenience and welfare. In this case, the plaintiffs are not asserting a private grievance, but public grievances relating to election improprieties that the commission has a duty to investigate and redress. Furthermore, the commission is authorized to act on behalf of precisely this class of complainants to further the interests of the public in properly conducted elections.

The purpose of the administrative remedy embodied in this statutory scheme is to guarantee that all elections, primaries and referenda in Connecticut are held according to law. The ability of only one person to trigger the commission's action ensures that any illegal-

ity or unfairness in the process cannot be overlooked even when the margin of victory is overwhelming. The broad investigatory powers of the commission in General Statutes § 9-7b (1) guarantee the commission access to the pertinent evidence that will enable it to make an informed decision. The sanctions that the commission is empowered to impose and its ability to refer "evidence" to state officials, including the attorney general, for further action gives the commission the power to fulfill the legislative intent to guarantee that elections be conducted according to law.

A final factor in our analysis is the practical notion of judicial economy that is involved. See *Cummings* v. *Tripp,* supra, 79. Election law complaints are better suited to the commission than the courts at the outset. Rather than forcing an aggrieved voter to hire counsel to make a claim, the administrative process permits an appropriate inquiry to be commenced upon the mere filing of a written complaint with the commission. The expertise of the commission in the area of elections makes it well suited to hear the case initially. Notions of judicial economy lead us to conclude that the proper procedure for alleging a violation of an election law is to file a complaint with the commission.

The fact that the plaintiffs have also alleged a violation of the free suffrage provision of the Connecticut constitution, article sixth, § 4, does not change our conclusion. "[D]irect judicial adjudication even of constitutional claims is not warranted when the relief sought by a litigant 'might conceivably have been obtained through an alternative [statutory] procedure . . . which [the litigant] has chosen to ignore.' *Sullivan* v. *State,* [189 Conn. 550, 559, 457 A.2d 304 (1983)]." *LaCroix* v. *Board of Education,* 199 Conn. 70, 87, 505 A.2d 1233 (1986). Although the plaintiffs have alleged a constitutional violation, the administrative remedy

provided in the statute could conceivably provide all the relief requested by the plaintiffs.

The plaintiffs in this case filed a complaint with the commission twenty-six days *after* the action was initiated in Superior Court. Because the remedy available through the state elections enforcement commission might well have afforded the plaintiffs an adequate administrative remedy, the Superior Court did not have subject matter jurisdiction to entertain this matter. The Superior Court should have dismissed the case for failure to exhaust administrative remedies.

There is no error.

In this opinion the other justices concurred.