POLYMER RESOURCES, LTD., ET AL. *v.*
TIMOTHY R.E. KEENEY, COMMISSIONER
OF ENVIRONMENTAL PROTECTION
(14769)

PETERS, C. J., CALLAHAN, BERDON, KATZ and PALMER, Js.

Argued June 9—decision released July 29, 1993

*Richard Blumenthal,* attorney general, with whom were *Joseph Rubin* and *Kimberly P. Massicotte,* assistant attorneys general, for the appellant (defendant).

*Stewart I. Edelstein,* with whom were *Christopher J. Smith* and, on the brief, *Stuart A. Epstein,* for the appellees (plaintiffs).

*Palmer S. McGee, Jr.,* and *Dean M. Cordiano* filed a brief for the town of Farmington et al. as amici curiae.

PALMER, J. The dispositive issue in this appeal is whether the trial court had subject matter jurisdiction to entertain the application of the plaintiffs, Polymer Resources, Ltd., and Leslie M. Klein[1] (Polymer), for a temporary injunction restraining the defendant, Timothy R.E. Keeney, the commissioner of environmental protection (commissioner), from requiring Polymer to conduct certain emission control testing at its manufacturing facility in Farmington. The trial court concluded that it had jurisdiction over Polymer's application for injunctive relief and, after a hearing, granted that application in part. The commissioner sought and received permission to file an immediate expedited appeal[2] from that portion of the trial court's order

[1] Leslie M. Klein is the sole shareholder and chairman of the board of Polymer Resources, Ltd., a Connecticut corporation.

[2] The chief justice granted the commissioner's petition to appeal the order of the trial court to this court pursuant to General Statutes § 52-265a, which provides: "(a) Notwithstanding the provisions of sections 52-264 and 52-265, any party to an action who is aggrieved by an order or decision of the supe-

granting Polymer injunctive relief. The commissioner claims that the trial court lacked subject matter jurisdiction to entertain Polymer's application for a temporary injunction because Polymer had failed to exhaust its administrative remedies. We agree with the commissioner and therefore reverse the judgment of the trial court.

Polymer processes plastic pellets at its thermoplastics manufacturing facility in Farmington. On April 9, 1992, after investigation of the gaseous emissions resulting from Polymer's manufacturing processes, the commissioner issued an ex parte cease and desist order (order) against Polymer pursuant to General Statutes § 22a-7.[3] In that order, the commissioner found that

---

rior court in an action which involves a matter of substantial public interest and in which delay may work a substantial injustice, may appeal under this section from the order or decision to the supreme court within two weeks from the date of the issuance of the order or decision. The appeal shall state the question of law on which it is based.

"(b) The chief justice shall, within one week of receipt of the appeal, rule whether the issue involves a substantial public interest and whether delay may work a substantial injustice.

"(c) Upon certification by the chief justice that a substantial public interest is involved and that delay may work a substantial injustice, the trial judge shall immediately transmit a certificate of his decision, together with a proper finding of fact, to the chief justice, who shall thereupon call a special session of the supreme court for the purpose of an immediate hearing upon the appeal.

"(d) The chief justice may make orders to expedite such appeals, including orders specifying the manner in which the record on appeal may be prepared."

"The 'order or decision' to which § 52-265a (a) refers need not be a final judgment. . . . Accordingly, this appeal is not jurisdictionally defective even though the [defendant is] appealing a temporary injunction, which, as an interlocutory order, would otherwise not be immediately appealable." (Citation omitted.) *Moshier* v. *Goodnow,* 217 Conn. 303, 305 n. 3, 586 A.2d 557 (1991).

[3] "[General Statutes] Sec. 22a-7. CEASE AND DESIST ORDERS. SERVICE. HEARINGS. INJUNCTIONS. (a) The commissioner, whenever he finds after investigation that any person is causing, engaging in or maintaining, or is about to cause, engage in or maintain, any condition or activity which, in his judgment, will result in or is likely to result in imminent and sub-

the manufacturing process employed by Polymer had resulted in the emission of certain substances[4] into the

stantial damage to the environment, or to public health within the jurisdiction of the commissioner under the provisions of chapters 440, 442, 445, 446a, 446c, 446d and 446k, or whenever he finds after investigation that there is a violation of the terms and conditions of a permit issued by him that is in his judgment substantial and continuous and it appears prejudicial to the interests of the people of the state to delay action until an opportunity for a hearing can be provided, or whenever he finds after investigation that any person is conducting, has conducted, or is about to conduct an activity which will result in or is likely to result in imminent and substantial damage to the environment, or to public health within the jurisdiction of the commissioner under the provisions of chapters 440, 442, 445, 446a, 446c, 446d and 446k for which a license, as defined in section 4-166, is required under the provisions of chapter 440, 442, 445, 446a, 446c, 446d or 446k without obtaining such license, may, without prior hearing, issue a cease and desist order in writing to such person to discontinue, abate or alleviate such condition or activity.

"(b) The commissioner shall serve any cease and desist order issued pursuant to this section in accordance with the provisions of section 52-57. The commissioner may also cause a copy of the order to be posted upon property which is the subject of the order, and no action for trespass shall lie for such posting. A cease and desist order shall be binding upon all persons against whom it is issued, their agents and any independent contractor engaged by such persons.

"(c) Upon receipt of such order such person shall immediately comply with such order. The commissioner shall, within ten days of the date of receipt of such order by all persons served with such order, hold a hearing to provide any such person an opportunity to be heard and show that such condition does not exist or such violation has not occurred or a license was not required or all required licenses were obtained. All briefs or legal memoranda to be presented in connection with such hearing shall be filed not later than ten days after such hearing. Such order shall remain in effect until fifteen days after the hearing within which time a new decision based on the hearing shall be made.

"(d) The attorney general, upon the request of the commissioner, may institute an action in the superior court for the judicial district of Hartford-New Britain at Hartford to enjoin any person from violating a cease and desist order issued pursuant to this section and to compel compliance with such order."

[4] The order identifies these substances as phenol, styrene, formaldehyde, acrolein, dibutylamine, triphenylphosphate, phenylether, 2,4,6 tribromophenal, and acrylonitrile.

ambient air[5] that "can cause and are causing or are likely to cause damage to the health of persons in the vicinity of the site, including headaches, throat inflammation, nose irritation, exacerbations of chronic respiratory conditions including asthma and chronic obstructive pulmonary disease, and other respiratory or pulmonary diseases and symptoms," and that those emissions were "likely to result in imminent and substantial damage to the public health."

The order directed Polymer to cease any manufacturing process that resulted in the emission of the specified substances, and prohibited Polymer from resuming such processing until it had: (1) installed pollution control equipment that adequately controlled emissions from its manufacturing processes; (2) conducted stack testing of its emissions in a manner and for a length of time approved by the commissioner; and (3) submitted a detailed written report for the commissioner's approval certifying that air emissions from the site would not result in imminent and substantial damage to the public health. The order also expressly authorized the commissioner to approve or disapprove any "document, report or other action" concerning the control of emissions into the air at the site, or to approve any such document, report or action "with such conditions or modifications as the commissioner deems necessary to carry out the purposes" of the order. The order further required Polymer, upon notification by the commissioner that any document, report or action was deficient, to correct that deficiency to the satisfaction of the commissioner.

Polymer ceased its plastic processing operations upon receipt of the order. On April 16, 1992, the commis-

---

[5] Section 22a-174-1 (a) (6) of the Regulations of Connecticut State Agencies provides: " 'Ambient air' means that portion of the atmosphere external to buildings, to which the general public has access."

sioner commenced a hearing pursuant to § 22a-7 (c) concerning the issuance of the ex parte order. On April 27, 1992, however, after several days of testimony before the department of environmental protection (DEP) hearing officer, Polymer notified the commissioner that it would no longer contest the order and, although not conceding the underlying findings of the commissioner, would agree to be bound by the terms of the order. The commissioner agreed that Polymer's acceptance of the terms of the order obviated the need for any further testimony before the hearing officer. On May 1, 1992, the hearing officer, therefore, filed a final administrative decision and order (final order), which specifically incorporated the provisions of the April 9, 1992 order.[6] The final order also contained the

---

[6] The final order incorporated, inter alia, the following provisions of the cease and desist order: "B. . . . (3) [Polymer] shall not resume the processing of plastic pellets or any other process which results in the emission of the substances identified in paragraph A (3), except for stack testing . . . until and unless [Polymer] does all of the following: (a) Installs pollution control equipment which adequately controls emissions from the processes conducted at the site; (b) (i) Submits a plan in writing to the Commissioner, which is approved by the Commissioner, to conduct stack testing in a manner and for a length of time approved by the Commissioner. The plans shall include stack testing of the processing of all substances which [Polymer] intends or desires to process at the site in the future. [Polymer] may not process any other substances in the future without prior approved stack testing in accordance with this Order. The plan shall include provisions for the observation and review of any and all aspects of the stack testing by representatives of the Commissioner to the extent the Commissioner deems appropriate. (ii) Submits a report to the Commissioner, which is approved in writing by the Commissioner certifying that air emissions from the site will not result in imminent and substantial damage to the public health. The report shall include a detailed description of the basis for its conclusions. (4) [Polymer] shall not be in full compliance with this Order until all actions required by this Order are completed, and [Polymer] otherwise completely and permanently ceases the emission of all substances which will result in, or will likely result in imminent and substantial damage to public health, including all emissions of all substances identified in paragraph A (3) above. (5) If the Commissioner notifies [Polymer] that any document, report or other action is deficient, and does not approve it with conditions or modifications, it is deemed disapproved, and [Polymer] shall correct the deficien-

hearing officer's finding that the "record lacks sufficient technical evidence to support imposition of an additional requirement for [precontrol]led stack testing."[7]

By letter dated May 14, 1992, the commissioner approved, with modifications, Polymer's proposed two phase stack testing plan. The plan provided that upon completion of the first phase of testing, which was to last a total of forty days, Polymer was to cease its manufacturing operations and to submit a plan for second phase testing. Upon approval by the commissioner of a second phase plan, Polymer would be authorized

cies and resubmit it within the time specified by the Commissioner or, if no time is specified by the Commissioner, within thirty days of the Commissioner's notice of deficiencies. In approving any document, report or other action under this Order, the Commissioner may approve the document, report or other action as submitted or performed or with such conditions or modifications as the Commissioner deems necessary to carry out the purposes of this Order. Nothing in this paragraph shall excuse noncompliance or delay. . . . (10) Nothing in this Order shall affect the Commissioner's authority to institute any proceeding to prevent or abate violations of law, including other violations relating to the emissions at issue in this Order, prevent or abate pollution, recover costs and natural resource damages, and to impose penalties for violations of law which are willful or criminally negligent or for which penalties have not been specifically provided in this Order, including but not limited to violations of any permit issued by the Commissioner. If at any time the Commissioner determines that the actions taken by [Polymer] pursuant to his Order have not fully alleviated the emission of substances which result in or are likely to result in imminent and substantial damage to the public health, the Commissioner may institute any proceeding to require [Polymer] to undertake further investigation or further action to prevent or abate such imminent and substantial damage. (11) Nothing in this Order shall relieve [Polymer] of other obligations under applicable federal, state and local law. (12) No provision of this Order and no action or inaction by the Commissioner shall be construed to constitute an assurance by the Commissioner that the actions taken by [Polymer] pursuant to this Order will result in compliance or prevent or abate pollution. . . . (15) Failure to comply with this order may subject [Polymer] to an injunction under Conn. Gen. Stat. Sec. § 22a-7."

[7] "Precontrol stack testing" is the testing of emissions resulting from the manufacturing process before those emissions have entered the pollution control system. The pollution control system relevant to this appeal is that system located in the stack at Polymer's plant.

to resume its manufacturing operations. The May 14, 1992 letter also directed Polymer to cease its manufacturing operations if any one of several events occurred, including the detection by DEP personnel of any odor emanating from the stack of Polymer's plant.

On May 18, 1992, Polymer resumed its manufacturing operations in a manner consistent with the terms of the first phase testing plan[8] and thereafter submitted reports to the commissioner as required by the final order.[9] By letter dated June 25, 1992, however, the commissioner ordered Polymer immediately to cease its manufacturing operations because on that date DEP personnel had detected an odor at the stack of Polymer's plant. The commissioner explained that the "presence of an odor is an indication that the control systems at the facility were not functioning properly, and were allowing substances which are likely to damage public health to escape into the air." In his June 25, 1992 letter, the commissioner invited Polymer to submit a report explaining the reason for the odor and a proposal to rectify the problem, "taking into consideration the apparent premature failure of the control systems, [and] consistent health complaints during the course of testing." The commissioner prohibited Polymer, however, from resuming its manufacturing operations and stack testing procedures until he had expressly authorized Polymer to do so.

[8] The stack testing plan approved by the commissioner permitted Polymer to conduct its manufacturing operations for twelve hours each day. Prior to April 9, 1992, Polymer had conducted such operations twenty-four hours a day. The commissioner ordered Polymer to reduce its hours of operation so that DEP personnel could monitor the emission control testing at the plant.

[9] Polymer also requested that the commissioner approve certain modifications to the emission control testing procedures required by the May 14, 1992 letter. The commissioner approved some of Polymer's requests and disapproved others.

Polymer ceased its manufacturing operations as directed and submitted a report to the commissioner, dated June 29, 1992, that sought to allay the commissioner's concerns about the odor detected at Polymer's stack. This report suggested a modification of the stack testing plan that had been previously approved by the commissioner and implemented by Polymer. By letter dated July 2, 1992, the commissioner agreed that "a modified testing program is necessary," but rejected Polymer's proposed revised testing plan. The commissioner explained that "[t]he odor detected at the stack on June 25, 1992, and the consistent presence in the test results of an unknown and unexpected hydrocarbon, dictate a modification of the testing approach. . . . [U]nless different data are collected, no person will be able to identify these unknown substances. It is presently impossible to conclude that the unknown hydrocarbon does not pose a health threat. Because of the unexpected presence of the unique odor at the stack on June 25, 1992 . . . it is similarly impossible to conclude that non-odorous, harmful chemicals are being controlled by the pollution control equipment. . . . We are not confident that [Polymer's revised] plan will adequately protect the health of the public given these unexpected and presently inexplicable circumstances." The commissioner's revised testing program required the testing of emissions before they entered the pollution control system in the stack in order "to identify all of the compounds that could potentially be released during the processing of polymers . . . in order to know what to test for at the outlet of the system."

Several days after it had received the commissioner's letter of July 2, 1992, Polymer submitted additional reports to the commissioner. Polymer contended that precontrol stack testing was unnecessary and unreasonably costly, that resumption of the manufacturing process would not pose any risk to the public health,

and that any odor from Polymer's stack emissions would be imperceptible to anyone off-site. In an effort to reach a compromise acceptable to the parties, DEP personnel and representatives of Polymer met to discuss the reports and Polymer's objections to the requirements of the July 2, 1992 letter.[10] On July 13, 1992, however, before the completion of these discussions, Polymer sought and obtained an ex parte temporary restraining order from the trial court, *Dean, J.*, prohibiting the commissioner from (1) interfering with Polymer's operations as permitted prior to the issuance of the July 2, 1992 letter, and (2) requiring Polymer to perform precontrol stack testing.[11]

Subsequently, a hearing was held on Polymer's application for a temporary injunction, which had been filed by Polymer with its application for a temporary restraining order. After thirty-three days of testimony, the trial court, *Nigro, J.*, denied the commissioner's renewed motion to dismiss for failure to exhaust available administrative remedies, and granted Polymer's application in part. Although it acknowledged that the testimony produced "a conflict among distinguished experts who have each presented impressive credentials," the court found that the commissioner's require-

[10] On July 7, 1992, before the commissioner had completed his review of the reports to determine what, if any, modifications to the terms of his July 2, 1992 letter would be acceptable, Polymer resumed its manufacturing operations and emissions testing program as authorized by the commissioner prior to July 2.

[11] On August 12, 1992, the trial court, *Dean, J.*, granted the commissioner's motion to dismiss Polymer's complaint for failure to serve the commissioner with a copy of the summons. Upon dismissal of the complaint, Polymer immediately filed a second complaint, identical to the first, as well as a second application for a temporary restraining order. The court granted that application for a temporary restraining order on August 12, 1992. The commissioner moved to dismiss the second complaint alleging, inter alia, a lack of subject matter jurisdiction because Polymer had failed to exhaust its administrative remedies. The court denied that motion on August 17, 1992.

ment of precontrol testing was "unnecessary and unreasonable," that compliance with that requirement would cause Polymer "irreparable loss,"[12] and that Polymer had no adequate remedy at law.[13] The court therefore enjoined the commissioner from requiring Polymer to conduct precontrol stack testing. The court also enjoined the commissioner from requiring Polymer to cease its manufacturing operations during any period of time needed by the commissioner to approve a phase two testing plan upon completion of the first phase of testing. The court denied Polymer's application for injunctive relief with respect to two other testing methods required by the commissioner,[14] but placed certain technical limitations on the commissioner as to the precise manner in which those testing methods were to be conducted.[15]

In this court, the commissioner claims that the trial court lacked subject matter jurisdiction to entertain Polymer's application for injunctive relief because Polymer had improperly failed to exhaust its administrative remedies. The commissioner claims specifically that

[12] The court found that Polymer had incurred significant economic harm as a result of its reduction in operating hours: the loss of forty-two operating days due to shutdowns required by the commissioner; and the expense of consultants, experts and pollution control and testing equipment. The court found further that "[c]ompliance with the [commissioner's requirements] might force [Polymer] out of business."

[13] The court concluded that "[t]he suggestion of the Commissioner that for any loss of business [Polymer] would have relief at law—to apply to the Connecticut Claims Commissioner for permission to sue the State for monetary damages is chimerical, or at least so unlikely as to be almost nonexistent."

[14] Polymer has not appealed the trial court's partial denial of its application for injunctive relief to enjoin the commissioner from requiring further stack testing.

[15] The trial court's decision on Polymer's application for a temporary injunction also provided, however, that the commissioner may "issue a cease and desist order . . . despite the partial injunction, whenever he reasonably deems there is an imminent and serious risk of injury to the public health because of processing or emissions at the plant."

Polymer failed to exhaust its administrative remedies because it had not sought a declaratory ruling by the commissioner pursuant to General Statutes § 4-176 (a)[16] on the issue of precontrol stack testing.[17] Polymer maintains that: (1) a declaratory ruling under § 4-176 (a) was not available to it; (2) the commissioner's imposition of precontrol stack testing constituted a modification of the final order and required the commissioner to issue a second cease and desist order pursuant to General Statutes § 4-181a (b);[18] and (3) even if Polymer would otherwise have been required to seek a

[16] General Statutes § 4-176 (a) provides: "Any person may petition an agency, or an agency may on its own motion initiate a proceeding, for a declaratory ruling as to the validity of any regulation, or the applicability to specified circumstances of a provision of the general statutes, a regulation, or a final decision on a matter within the jurisdiction of the agency."

[17] The commissioner also claims that Polymer failed to exhaust its administrative remedies by not contesting the cease and desist order pursuant to General Statutes § 22a-7 (c); see footnote 3; and by failing to appeal the May 1, 1992 final order to the Superior Court within forty-five days as authorized by General Statutes § 4-183. Polymer contends that it was not required either to contest the cease and desist order or to appeal the final order because neither order authorized the commissioner to require Polymer to conduct precontrol stack testing. Polymer further argues that it did not receive notice of the commissioner's decision purporting to require precontrol stack testing until July 2, 1992, several weeks after the date by which Polymer would have been required to file any appeal of the final order. We do not address these arguments because we conclude that Polymer failed to exhaust the administrative remedy available to it pursuant to General Statutes § 4-176 (a).

[18] General Statutes § 4-181a, entitled "Contested Cases. Reconsideration. Modification," provides in part: "(b) On a showing of changed conditions, the agency may reverse or modify the final decision, at any time, at the request of any person or on the agency's own motion. The procedure set forth in this chapter for contested cases shall be applicable to any proceeding in which such reversal or modification of any final decision is to be considered. The party or parties who were the subject of the original final decision, or their successors, if known, and intervenors in the original contested case, shall be notified of the proceeding and shall be given the opportunity to participate in the proceeding. Any decision to reverse or modify a final decision shall make provision for the rights or privileges of any person who has been shown to have relied on such final decision."

declaratory ruling by the commissioner on the issue of precontrol stack testing, it need not have done so because it had satisfied several exceptions to the exhaustion doctrine. We agree with the commissioner.[19]

I

" 'It is a settled principle of administrative law that, if an adequate administrative remedy exists, it must be exhausted before the Superior Court will obtain jurisdiction to act in the matter.' " *LaCroix* v. *Board of Education,* 199 Conn. 70, 83–84, 505 A.2d 1233 (1986), quoting *Connecticut Mobile Home Assn., Inc.* v. *Jensen's, Inc.,* 178 Conn. 586, 588, 424 A.2d 285 (1979). Furthermore, "[b]ecause the exhaustion doctrine implicates subject matter jurisdiction, we must decide as a threshold matter whether that doctrine requires dismissal of the plaintiffs' claim. . . . [W]henever a court discovers that it has no jurisdiction, it is bound to dismiss the case, without regard to its previous rulings." (Citations omitted; internal quotation marks omitted.) *Concerned Citizens of Sterling* v. *Sterling,* 204 Conn. 551, 556–57, 529 A.2d 666 (1987).[20]

Polymer argues that it was not required to seek a declaratory ruling pursuant to § 4-176 (a) because the commissioner lacked statutory authority to direct Poly-

---

[19] The commissioner also makes several claims concerning the trial court's decision on Polymer's application for a temporary injunction. We need not address these arguments, however, because we conclude that the trial court lacked subject matter jurisdiction to entertain Polymer's application.

[20] "The doctrine of exhaustion is grounded in a policy of fostering an orderly process of administrative adjudication and judicial review in which a reviewing court will have the benefit of the agency's findings and conclusions. . . . The doctrine . . . furthers the salutary goals of relieving the courts of the burden of deciding questions entrusted to an agency . . . in advance of possible judicial review." (Citation omitted; internal quotation marks omitted.) *Concerned Citizens of Sterling* v. *Sterling,* 204 Conn. 551, 557, 529 A.2d 666 (1987). Moreover, resolution of the issues at the administrative level may render judicial review unnecessary. See *Housing Authority* v. *Papandrea,* 222 Conn. 414, 420–21, 610 A.2d 637 (1992).

mer to conduct precontrol stack testing. Specifically, Polymer claims that the authority granted to the commissioner under General Statutes § 22a-174 to adopt regulations to control and prohibit air pollution does not extend to the regulation of emissions before those emissions had been treated by Polymer's pollution control system. We have held, however, that "[w]here there is in place a mechanism for adequate judicial review, such as that contained in [General Statutes] § 4-183,[21] it is the general rule that an administrative agency may and must determine whether it has jurisdiction in a particular situation. When a particular statute authorizes an administrative agency to act in a particular situation it necessarily confers upon such agency authority to determine whether the situation is such as to authorize the agency to act—that is, to determine the coverage of the statute—and this question need not, and in fact cannot, be initially decided by a court." (Internal quotation marks omitted.) *Greater Bridgeport Transit District* v. *Local Union 1336,* 211 Conn. 436, 439, 559 A.2d 1113 (1989); *Cannata* v. *Department of Environmental Protection,* 215 Conn. 616, 623, 577 A.2d 1017 (1990). Because Polymer could have appealed to the Superior Court pursuant to § 4-183 from any adverse declaratory ruling by the commissioner concerning his authority to direct Polymer to conduct precontrol stack testing, Polymer was required to request such a declaratory ruling before seeking redress in court.

## II

Polymer next claims that it need not have sought a declaratory ruling on the issue of precontrol stack test-

[21] General Statutes § 4-183 provides in relevant part: "(a) A person who has exhausted all administrative remedies available within the agency and who is aggrieved by a final decision may appeal to the superior court as provided in this section. The filing of a petition for reconsideration is not a prerequisite to the filing of such an appeal." A declaratory ruling is a "final decision" under § 4-183. See General Statutes § 4-166 (3).

ing because the commissioner's letter of July 2, 1992, constituted a modification of the final order under § 4-181a (b) for which the commissioner was required to issue a second cease and desist order. Polymer bases this argument on the assertion that the commissioner could not have construed the final order as authorizing him to require Polymer to conduct precontrol stack testing. We disagree with Polymer.

The final order, cast in broad terms consistent with the commissioner's broad statutory mandate in matters of environmental protection,[22] provided the commissioner with wide latitude to monitor and regulate Polymer's manufacturing processes. That order required Polymer, inter alia, to cease its plastics processing operations until it had: (1) installed adequate pollution control equipment; (2) submitted a plan to the commissioner for stack testing of its emissions; (3) ceased the emission of any substance likely to result in imminent and substantial damage to the public health; and (4) submitted a detailed report to the commissioner certifying that its emissions would not cause such damage. Moreover, all documents and reports submitted to the commissioner and all actions undertaken by Polymer relating to its gaseous emissions required approval by the commissioner prior to the resumption of its manufacturing processes.

---

[22] General Statutes § 22a-5 directs the commissioner to "carry out the environmental policies of the state" and vests in the commissioner "all powers necessary and convenient to faithfully discharge this duty." Section 22a-5 also provides that the commissioner shall "(a) promote and coordinate management of water, land and air resources to assure their protection, enhancement and proper allocation and utilization . . . [and] (e) provide for the prevention and abatement of all water, land and air pollution including, but not limited to, that related to particulates, gases, dust, vapors, noise, radiation, odors, nutrients and cooled or heated liquids, gases and solids . . . ." The commissioner is further empowered to promulgate environmental standards and regulations to control and prohibit air pollution. See General Statutes §§ 22a-6 and 22a-174. The legislature, therefore, has vested in the commissioner broad authority and responsibility in matters of environmental protection.

In addition, the precontrol emissions testing required by the commissioner's letter of July 2, 1992, was to have been conducted at the stack of Polymer's plant. Although such tests were to have been performed on the gaseous emissions before they had reached Polymer's pollution control system, the precontrol testing described in the commissioner's July 2, 1992 letter was, therefore, a method of stack testing. The final order, moreover, places no limitations or conditions on the commissioner's discretion with respect to the manner in which Polymer was to have conducted such testing.

Indeed, the final order required Polymer to submit a written stack testing plan "to conduct stack testing *in a manner and for a length of time approved by the commissioner.* The plan shall include stack testing of the processing of all substances which [Polymer] intends or desires to process at the site in the future." (Emphasis added.) This sweeping language, which Polymer chose not to contest, granted the commissioner broad authority to require stack testing of a method and duration that, in the commissioner's judgment, would have reduced the risk of any damage to the environment. We agree with the commissioner, therefore, that he reasonably could have interpreted the term "stack testing" in the final order to include the testing of emissions before those emissions had entered Polymer's pollution control system in the stack.

Polymer contends that a different conclusion is required because the hearing officer determined that the technical evidence presented at the hearing on the cease and desist order did not warrant the imposition of precontrol stack testing. The hearing was truncated, however, due to Polymer's decision, announced during the hearing and before the commissioner had concluded the presentation of his evidence, to abide by the broad terms of the commissioner's order. Polymer's decision not to contest the terms of the order rendered

any further presentation of evidence by the commissioner unnecessary. In such circumstances, and in view of the expansive language of the final order, we are persuaded that the order can reasonably be interpreted to have authorized the imposition of precontrol stack testing by the commissioner. We conclude, therefore, that the commissioner was not obligated to issue a second cease and desist order directing Polymer to conduct precontrol stack testing, and that Polymer was required to have requested a declaratory ruling from the commissioner on the issue of such testing.

## III

Polymer finally contends that it should be excused for failing to exhaust its administrative remedies because it has satisfied several exceptions to the exhaustion rule. "There are some exceptions to the exhaustion doctrine, 'although we have recognized such exceptions only infrequently and only for narrowly defined purposes.' " *Pet* v. *Department of Health Services,* 207 Conn. 346, 353, 542 A.2d 672 (1988), quoting *LaCroix* v. *Board of Education,* supra, 79. We have recognized that a party aggrieved by a decision of an administrative agency may be excused from exhaustion of administrative remedies if: recourse to the administrative remedy would be futile or inadequate; *Greenwich* v. *Liquor Control Commission,* 191 Conn. 528, 541–42, 469 A.2d 382 (1983); the procedures followed by the administrative agency are constitutionally infirm; *LaCroix* v. *Board of Education,* supra; or injunctive relief from an agency decision is necessary to prevent immediate and irreparable harm. *Pet* v. *Department of Health Services,* supra, 370. We do not agree that Polymer's failure to satisfy the exhaustion requirement falls into any of these recognized exceptions to that rule.

Polymer first claims that it would have been futile for it to have sought a declaratory ruling by the commissioner on the issue of precontrol stack testing. See *Greenwich* v. *Liquor Control Commission,* supra. Polymer argues that the commissioner had already directed it to conduct precontrol testing and that there was no reason for Polymer to have believed that the commissioner would have reversed or modified his decision. We have held, however, that a mere conclusory assertion that an agency will not reconsider its decision does not excuse compliance with the exhaustion requirement. *Housing Authority* v. *Papandrea,* 222 Conn. 414, 430–32, 610 A.2d 637 (1992); *Lacroix* v. *Board of Education,* supra, 84–85. Moreover, the record reflects the commissioner's willingness to consider proposals by Polymer to modify or eliminate certain testing requirements originally imposed by the commissioner.[23] Polymer's argument that it need not have sought a

---

[23] See footnote 9. We also note that, prior to the granting of the application for a temporary restraining order on July 7, 1992, the parties were discussing possible modifications to the precontrol stack testing requirement set forth in the commissioner's letter of July 2, 1992. See footnote 10. As a result of those discussions, and after a review of the reports submitted to him by Polymer, the commissioner notified Polymer by letter dated July 21, 1992, that "[a]s I was prepared to do when I was served with your court papers, I grant your request to postpone pre-control stack testing as set forth in my letter of July 2, 1992, with . . . [certain] conditions, in order to allow my staff and the Department of Health Services time to review recent reports submitted, and to consider modifications of my pre-control stack testing requirements." In a subsequent letter to Polymer, dated August 21, 1992, the commissioner modified and explained his July 21, 1992 letter as follows: "Based on lengthy discussions with . . . your representatives, the Department of Health Services, my staff, and others, I have concluded that a form of pre-control stack testing is still necessary to meet the objectives of [the C]ease and Desist Order . . . and to provide the information necessary to conduct a reliable health risk assessment. However, I believe that certain changes to the July 2, 1992 pre-control testing program are acceptable, and will produce the required information. If and when I am no longer restrained or otherwise prevented from doing so, I intend to modify my July 2, 1992 letter. If you have any questions about this matter, my staff is available to discuss them with you."

declaratory ruling because it would have been futile to have done so is, therefore, without merit.

Polymer also contends that its claim of a constitutional violation by the commissioner exempted it from the exhaustion requirement. See *Lacroix* v. *Board of Education,* supra. However, "[s]imply bringing a constitutional challenge to an agency's actions will not necessarily excuse a failure to follow an available statutory appeal process." Id., 79. Moreover, "[d]irect adjudication even of constitutional claims is not warranted when the relief sought by a litigant might conceivably have been obtained through an alternative [statutory] procedure . . . which [the litigant] has chosen to ignore. . . ." (Internal quotation marks omitted.) *Pet* v. *Department of Health Services,* supra, 354. "[W]e continue to limit any judicial bypass of even colorable constitutional claims to instances of demonstrable futility in pursuing an available administrative remedy." Id., 356.

Polymer alleges, without more, that the commissioner, "acting under color of state law, has deprived Polymer of its rights, privileges, and immunities secured by the Constitution and the laws of the State of Connecticut, including Polymer's rights to due process and equal protection as afforded by the Constitution of the State of Connecticut." Although Polymer's complaint fails to explain more precisely the nature of the alleged constitutional violation, Polymer claims on appeal that the commissioner has violated its "right to pursue a lawful business." We are not persuaded that Polymer's conclusory assertion of such a constitutional claim is sufficiently clear and specific to exempt it from the exhaustion requirement in this case. Moreover, because the commissioner would have been required to seek to enforce the terms of the final order in the Superior Court pursuant to General Statutes § 22a-180

(a),[24] Polymer could have obtained relief from any undue interference with its business operations by seeking a stay of the enforcement of the precontrol stack testing requirement imposed by the commissioner. Because, therefore, Polymer would have had the opportunity to vindicate its rights "through an alternative statutory procedure . . . which [Polymer] has chosen to ignore"; *Pet* v. *Department of Health Services,* supra, 354; Polymer's allegation of a constitutional violation did not exempt it from the exhaustion requirement.

Polymer also asserts that it would have suffered irreparable harm if required to seek a declaratory ruling from the commissioner and that therefore it was entitled to an exception from the exhaustion rule. See id., 370; *Harwinton Drilling & Engineering Co.* v. *Public Utilities Control Authority,* 188 Conn. 90, 98, 448 A.2d 210 (1982). Specifically, Polymer argues that the declaratory ruling process might have taken as long as 180 days to complete,[25] and that imposition of the

[24] General Statutes § 22a-180 (a) provides: "In addition to those penalties provided by section 22a-175, any person who violates any provision of this chapter, or any regulation, order or permit adopted or issued thereunder may be assessed a civil penalty by the court not to exceed twenty-five thousand dollars for each offense. Each violation shall be a separate and distinct offense and, in the case of a continuing violation, each day of continuance thereof shall be deemed to be a separate and distinct offense. The commissioner of environmental protection may request the attorney general to bring a civil action in the superior court for the judicial district of Hartford-New Britain at Hartford to have such assessment imposed by the court. In addition, the commissioner may request the attorney general to institute a civil action in the superior court for the judicial district of Hartford-New Britain at Hartford for injunctive relief to restrain any further violation of any provision of this chapter, or any regulation, order or permit adopted or issued thereunder. The superior court shall grant such relief upon notice and hearing. If two or more persons are responsible for a violation of any provision of this chapter, or any regulation, order or permit adopted or issued thereunder, such persons shall be jointly and severally liable."

[25] General Statutes § 4-176 provides in relevant part: "(e) Within sixty days after receipt of a petition for a declaratory ruling, an agency in writing shall: (1) Issue a ruling declaring the validity of a regulation or the

precontrol stack testing requirement during that period would have resulted in plant shutdowns, loss of business opportunities and goodwill, and excessive expense due to the cost of the necessary pollution control equipment and testing. As we have discussed, however, Polymer could have requested a stay of the precontrol stack testing requirement when the commissioner sought to enforce the terms of his letter of July 2, 1992. Because Polymer had an adequate remedy at law,[26] it would not have been entitled to injunctive relief; see *Pet* v. *Department of Health Services,* supra, 371; and was required, therefore, to have requested a declaratory ruling from the commissioner.

We conclude that Polymer failed to exhaust its administrative remedies and that its failure to do so was not excused by any exception to the exhaustion rule. The trial court, therefore, lacked subject matter jurisdiction to entertain Polymer's application for injunctive relief.

The judgment is reversed and the case is remanded to the trial court with direction to render judgment dismissing the complaint.

In this opinion the other justices concurred.

applicability of the provision of the general statutes, the regulation, or the final decision in question to the specified circumstances, (2) order the matter set for specified proceedings, (3) agree to issue a declaratory ruling by a specified date, (4) decide not to issue a declaratory ruling and initiate regulation-making proceedings, under section 4-168, on the subject, or (5) decide not to issue a declaratory ruling, stating the reasons for its action. . . .

"(i) If an agency does not issue a declaratory ruling within one hundred eighty days after the filing of a petition therefor, or within such longer period as may be agreed by the parties, the agency shall be deemed to have decided not to issue such ruling."

[26] Polymer also could have sought authorization from the claims commissioner to sue the state for damages due to alleged improper conduct by the commissioner of environmental protection acting in his official capacity. See General Statutes § 4-141 et seq. The trial court concluded, however, that recourse to the claims commissioner did not constitute an adequate remedy at law. See footnote 13. We need not reach this issue and therefore decline to do so.